**Supreme Court**

No. 2008-121-C.A.

(K1/05-570A)

| | |
|---|---|
| State | : |
| v. | : |
| Gerardo E. Martinez. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                              :

v.                               :

Gerardo E. Martinez.              :


Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Indeglia, for the Court.**   The defendant, Gerardo E. Martinez (Martinez or defendant), appeals from a conviction of murder in the first degree and an imposition by the trial justice of a sentence of life imprisonment without the possibility of parole.   On appeal, he contends that the trial justice committed reversible error in (1) admitting acts of prior misconduct that he allegedly committed against the decedent; (2) denying his motion for a new trial; and (3) sentencing him to life imprisonment without the possibility of parole.   After reviewing the record and considering the parties' written submissions and oral arguments, we discern no error on the part of the trial justice and affirm the judgment of the Superior Court.

**I**

**Facts and Travel**

In October 2005, a grand jury indicted Martinez on charges of first-degree murder in violation of G.L. 1956 § 11-23-1 and G.L. 1956 § 12-29-5[1] (count 1) and driving a motor vehicle without consent of the owner in violation of G.L. 1956 § 31-9-1 (count 2).[2]   After Martinez

---

[1] In pertinent part, G.L. 1956 § 12-29-5(a) applies to "[e]very person convicted of * * * a crime involving domestic violence * * *."

[2] The defendant does not contest his conviction on count 2 in this appeal.

pleaded not guilty to the charges, the Attorney General filed a notice of intent to seek a sentence of life imprisonment without the possibility of parole if Martinez were convicted of first-degree murder, pursuant to G.L. 1956 § 12-19.2-3.

Over the course of an eight-day trial, the prosecution presented twenty-five witnesses who testified to the following facts. At the outset, we acknowledge that many of these facts are graphic and disturbing. We recite them in necessary detail because they are relevant to our evaluation of whether (1) the crime amounted to murder in the first degree and (2) the sentence of life imprisonment without the possibility of parole was appropriate.

Lindsay Ann Burke, the decedent, graduated from Rhode Island College in May 2004 with a bachelor's degree in special and elementary education. At the time of her death, Lindsay[3] was employed by Opportunities Unlimited, where she was responsible for assisting disabled adults living in group homes.

Lindsay met Martinez while attending a wedding in September 2003. They started dating shortly thereafter. Her mother, Anna Burke, testified that "[she] could tell [Lindsay] was swept off her feet" when she met Martinez "and [that Lindsay] was on cloud nine." Anna recalled her first impression of Martinez: "He was very polite. He was soft spoken. * * * He was very respectful." However, she testified that her opinion of Martinez later changed and that her relationship with Lindsay soon became strained when she told Lindsay that she "no longer approved" of Martinez.

In March 2004, while she was still a student at Rhode Island College, Lindsay moved out of her parents' home to live with Martinez. Anna testified that she continued to see Lindsay "approximately once a week"—usually on Sundays, for dinner. When Martinez eventually

---

[3] This Court means no disrespect by referring to some individuals in this opinion by their first names. It is for clarity purposes only that first names are used throughout this opinion.

blocked Anna's phone number from calling his home, Anna continued to communicate with Lindsay on her cell phone. According to Anna, in March 2005, Lindsay became "displeased" with her relationship with Martinez and moved back into her parents' home. Nonetheless, Lindsay "continued to take [Martinez's] phone calls and talk to him." By June 2005, Lindsay was staying at Martinez's home six nights a week. She once again moved out of her parents' home to live with Martinez "sometime" in July 2005.

Around the third week of August 2005, Lindsay told Anna that "she was probably going to leave [Martinez] * * * and move out of his house * * *." Lindsay told her that she had met somebody else—a man named Chris, who worked as a cook at the Cranston Senior Center. This man was later determined to be Christopher Barrett.

At trial, Barrett testified that he met Lindsay in May 2005. At that time, he was incarcerated at the Adult Correctional Institutions (ACI) for a second-degree robbery conviction, and he worked at the Cranston Senior Center on work release. At the time of trial, Barrett had an extensive criminal record, which was related to the jury during his testimony. After meeting Lindsay, they soon developed a friendship. Barrett testified that Lindsay would visit him three to four times a week during visiting hours at the ACI. Barrett testified that he wrote her letters and notes—about fifteen in total—and that he and Lindsay grew close and loved each other. He also gave her some photographs of himself, in which he posed as a "body-builder." In addition, Barrett gave her about $1,300 while he was incarcerated at the ACI.

According to Barrett, Lindsay had told him that she was involved in a relationship with Martinez and that she was "very unhappy." Barrett then testified, over defense counsel's objections pursuant to Rule 404(b) of the Rhode Island Rules of Evidence, that Lindsay told him that Martinez "had been physically abusive on more than one occasion, that he was very

- 3 -

controlling, [and] that he had alienated her."[4] Lindsay never told Barrett specifically where on her body Martinez had hit her, only that "he was really smart and he knew how to * * * do it in ways where it would be covered by clothing." She also told Barrett that she was going to leave Martinez and move in with her brother, Christopher Burke.

Lindsay's supervisor at Opportunities Unlimited, Katherine Baxter, also testified at trial. Defense counsel also objected to her testimony on Rule 404(b) grounds. Baxter testified that she and Lindsay developed a close personal relationship during April 2005. Baxter confided in Lindsay that she was "depressed" about her recent breakup. Lindsay then opened up to her about her own relationship with Martinez. Lindsay told Baxter that her relationship with Martinez was "turbulent [and that] there was abuse, verbal[ ] and physical." Lindsay confided that "he would twist her arm behind her back" and that he once "punched her in her right thigh over and over." On a different occasion, Baxter noticed that Lindsay had "a red mark on her face" which was "circular" and "near * * * her mouth." Lindsay told Baxter that Martinez had "hit her."

Lindsay eventually moved in with her brother, Christopher, in late August 2005. Anna testified that she last saw Lindsay at Christopher's North Kingstown home on September 11, 2005. A few days later, on September 14, 2005, Anna recalled receiving a phone call from Christopher, in which he told her that Lindsay was uncharacteristically not responding to his phone calls. Anna testified that she then called Lindsay's cell phone, left her a message, called the Warwick police to report Lindsay missing, and then drove to Martinez's home. She further testified that she called Lindsay's employer.

Officer John McHale of the Warwick Police Department testified that he was dispatched at around 4:16 p.m. that afternoon in response to Anna's phone call. He met with Anna and her

---

[4] We elaborate on defense counsel's objections pursuant to Rule 404(b) of the Rhode Island Rules of Evidence in Part III-A, infra.

husband, Lindsay's father, at a location next door to Martinez's home in Warwick. Anna told him that Lindsay had not shown up for work, and that they had not spoken in a couple of days, which, according to Anna, was "highly unusual." He also found out that Lindsay had been involved with Martinez.

At that point, McHale walked over to Martinez's home, located at 1917 Warwick Avenue. He checked the registration on the pickup truck parked in the driveway and learned that the vehicle was registered to Martinez at that address. He then knocked on the front door, which proved futile. He noted that the front door was locked and the shades were drawn. He then told the Burkes that he "would keep a check" on Martinez's home throughout the night. He instructed the Burkes to contact the North Kingstown police to report Lindsay as a missing person, because Lindsay actually resided at her brother's home in that town.

McHale was again dispatched to Martinez's home at approximately 5:40 p.m. that afternoon. McHale had learned that the New Hampshire State Police had found Lindsay's vehicle and that it had recently been involved in an accident. The operator of the vehicle was identified as Martinez.[5] The New Hampshire State Police informed McHale that Martinez had cut himself in an attempted suicide and that he was "unconscious when they located him" inside the vehicle. He told McHale that they had also found a suicide note in the vehicle, signed by Martinez, which stated in relevant part that "[s]he f***ed me over. I didn't want to kill her but I did."[6]

---

[5] Martinez was found inside Lindsay's vehicle at a rest area in New Hampshire, after the vehicle hit a tree. A rest-area attendant found Martinez alone inside, vomiting. She then dialed 911. He eventually fell out of the car and collapsed before the police arrived.

[6] The entirety of the suicide note was read into evidence at trial by Trooper Sean Faherty of the New Hampshire State Police.

In light of this new information, McHale's supervisor ordered him to return to Martinez's home. When he arrived, Martinez's mother, Elizabeth Belina, was just exiting her vehicle. She told him that she was there to "check on her son since she hadn't heard from him and he also did not show up for work." They waited a few minutes for other officers to arrive. Belina gave the officers her key to Martinez's home, which they then entered. McHale testified that he walked directly to the back of the residence, while the two other officers with him went to other sections of the home. He first saw the bathroom door, which was closed. He recalled that he saw dried blood on the doorknob, and that there were droplets of blood on the floor as well as on the door itself. Another officer, wearing gloves, then opened that door. When McHale stepped into the bathroom, he "immediately notice[d] * * * a large amount of blood, a pool of blood on the floor, * * * [and] blood on the tub."

He then found Lindsay's bloodied body in the bathtub covered with a blanket. He noted that the glass doors of the tub and shower were "off the track" and leaning into the tub. He then immediately went to the front of the house to secure the front door, and he started a crime scene log. He maintained his post at the front door until approximately 11:45 p.m., at which time he left and completed his police report.

Detective Daniel Gillis (Det. Gillis), a member of the BCI Unit of the Warwick Police Department, testified that he was called to Martinez's home around 6 p.m. that evening. He arrived with Det. Walter Williams (Det. Williams), another BCI Unit member. They waited outside Martinez's home until a search warrant was issued at around 10 p.m. that night. Detective Gillis then photographed the scene inside the home and made a sketch of its layout. At trial, he described the numerous photographs he had taken at Martinez's home that night. In the living room, there was a blood stain on the couch cushion and several blood drops on the floor.

He testified that there was a pink pocketbook, a black billfold, and a three-and-a-half inch knife on the couch in the living room. The black billfold contained Lindsay's driver's license, among other items.

In the bathroom, he photographed a knife on the vanity counter. The knife blade was stained with blood and contained strands of hair. He also photographed personal items found in the sink, including a photograph of "a male subject [wearing] khaki pants, no shirt,"[7] as well as various checks payable to Lindsay from her employer. He photographed a blood splatter on the mini-blind, "an arc of blood" on the back wall, and "blood * * * coming up the toilet, on the rim of the toilet and, also, in the bowl." Additionally, he photographed a stuffed animal, recognized as "Scooby Doo," which was found on top of Lindsay's body in the bathtub.

Carl Zambrano, an investigator from the medical examiner's office, arrived shortly thereafter. Although Zambrano did not testify at trial, Det. Gillis testified to what he himself observed. He stated that he watched Zambrano remove the blanket covering Lindsay's unclothed body. The transport team from the medical examiner's office then removed Lindsay's body from the bathtub. While Zambrano began his investigation and checked Lindsay's body, Det. Gillis continued to take photographs. He photographed a "large laceration to the back of her neck," "large lacerations" on her chest, "bruising to the face area," and other wounds to her body.

As noted above, Det. Williams also responded to Martinez's home that evening. At trial, he was qualified as an expert in both fingerprints and blood stain analysis. He testified that there was a blood stain on the couch in the living room and bloody clothes in both the kitchen and the bathroom. He identified fingerprints belonging to Lindsay on various papers in the bathroom.

---

[7] The shirtless man pictured in the photograph was later determined to be Christopher Barrett.

However, he was unable to develop any identifiable fingerprints on the photograph of Barrett, which was found on the bathroom vanity. He testified that there were "transfer patterns of blood overlapping the lip of the * * * sink" in the bathroom, which he identified as originating from Lindsay's hand.

Further, Det. Williams observed blood stains on the wall in the bathroom. The shape of the blood stains led him to conclude that they were the result of "arterial spurts." He testified that, from his observations of the arc patterns of blood on the wall, "the blood from [Lindsay's] artery was not being ejected from one spot. It appear[ed] that the artery was also moving and projecting blood and it was spattering the blood on the surface at a perpendicular angle." He noted that the wastebasket in the bathroom was full of rolled-up toilet paper with transfers of "small, significant amount[s] of blood" consistent with a minor injury, such as a nosebleed. He also testified that the bathroom floor contained a "large volume of blood." He concluded that blood had spattered from many different directions. He further determined that, based on the amount of blood present in the bathroom, the fatal injury to Lindsay occurred in the bathroom. He stated that any injuries suffered in the living room occurred prior to the fatal bathroom injury, but he could not state with certainty how much time had elapsed between her various injuries.

Sharon Mallard, an employee of the Rhode Island Department of Health at the Forensic Biology Laboratory, performed DNA analysis on the evidence collected by the police at the crime scene. She testified that Lindsay's DNA matched the blood on a T-shirt found in Martinez's bathroom, the men's jeans in the kitchen, the women's sneakers, the women's pants from the bathroom, the men's sneakers, the bear-claw knife in the bathroom, the tissues in the

wastebasket, and a cutting of the stain from the living-room couch. She also found Martinez's DNA under one of Lindsay's fingernails.[8]

Peter Gillespie, M.D., an assistant medical examiner for the Rhode Island Department of Health, also testified at trial. He was qualified as an expert in forensic pathology. He testified that he performed an autopsy of Lindsay's body on September 15, 2005. He first examined Lindsay's hands, which had been bagged to preserve evidence. He noticed "traumatic injuries on [her] hands," which were "bloody." He noted that there "appeared to be a bloody material underneath [her] fingernails." He further testified that there were three contusions on her forehead and that her nose was "extensively fractured." He stated that it was unlikely that all three contusions were caused by one blow, since each was on a different area of her forehead. He thus concluded that each contusion was caused by "a single contact with her forehead"— "something striking her forehead or her forehead striking something."

Doctor Gillespie further testified that on the left side of Lindsay's neck was a "very large incised wound, very deep" which had cut the carotid artery, the jugular vein, and the trachea. In addition to the incised wound, he also noted a stab wound on her neck. He noted that there were "traumatic injuries present on [her] right upper chest" which consisted of "two punctate puncture wounds." She also had a superficial incised wound on her right leg.

There were eight contusions present on Lindsay's skull, which, according to Dr. Gillespie, occurred while Lindsay was still alive. He determined that the cause of death was "massive hemorrhage due to sharp force wounds of the left carotid artery and the left jugular vein." He testified that Lindsay remained alive for a period of time after the fatal wound

---

[8] Detective Eric Johnson of the Warwick Police Department testified that he drove to New Hampshire to interview Martinez on the night of September 14, 2005. While he was there, he took photographs of Martinez, which revealed scratch marks on the side of his stomach, as well as lacerations on his forearms.

occurred.[9]  He further determined that the manner of death was homicide.  He testified that the time of death occurred "probably [twenty-four to thirty-six] hours" prior to the time he performed the autopsy, which was 9:45 a.m. on September 15, 2005.

The vice president of Coastway Credit Union was also subpoenaed to testify at trial.  A printout of the daily transactions at Coastway Credit Union, located on Warwick Avenue, revealed that on September 13, 2005 at 11:56 a.m., Martinez withdrew $500 from the drive-up ATM.  This was further corroborated by the bank's own video surveillance.

A warranted search of Martinez's home computer performed by the Warwick police further revealed that between 12:43 p.m. and 12:59 p.m. on September 13, 2005, Martinez conducted Internet searches pertaining to gun shops, gun shows, and waiting periods for gun purchases in New Hampshire.  At 1:31 p.m. that day, Martinez then videotaped a statement in which he apologized for what he had done to Lindsay and said goodbye to his family.  In his statement, he further said, "I'll never understand what happened to me.  The rage that just filled me in a split second to make me do what I did that I did.  I'm sorry but I apologize.  I know that's not enough."

After making the videotape, Martinez eventually drove Lindsay's vehicle to New Hampshire.  As previously stated, a rest-area attendant in New Hampshire found Martinez alone inside Lindsay's vehicle.[10]  The New Hampshire State Police seized several items from the vehicle.  The vehicle and the seized items were then transported to the Warwick Police Department.  Detectives Williams and Gillis responded to examine the vehicle for evidence.  Detective Williams testified that the seized items included: a blood-stained towel, cards and

---

[9] On redirect examination, he testified that this period of time lasted for about "five or ten minutes."

[10] See note 5, supra.

letters sent to Lindsay from Barrett, photographs of a shirtless Barrett, a list of visiting hours at the ACI, a Scooby Doo Father's Day card from Lindsay to Martinez,[11] a white notepad containing Martinez's suicide note, and a white three-ring binder belonging to Martinez, which contained his various certificates of achievement and photographs of Lindsay and him.

Martinez's suicide note, which was found inside the vehicle, included the following statement:

> "I found out that Linds was talking to someone * * * so she was cheating on me. * * * I found love letters. * * * I snapped. I had told my therapist that I felt that all I needed was one more thing to push me over the edge. I had been f***ed over by to [sic] many women. * * * If I could take back what I did to [Lindsay], I would have not killed her, but I did. I went crazy, crazy. * * * The girl that stopped me from killing Diane was the one that f***ed me over."

He also wrote that he "felt like [he] went insane." He wrote that he was "so sorry for everything especially for what [he] just did to Lindsay and all the families."

Detective Eric Johnson of the Warwick Police Department testified that he arrived in New Hampshire just after midnight on September 15, 2005. He then gave Martinez his Miranda warnings and interviewed him. The video recording of this interview was played for the jury at trial. In the interview, when asked "what happened back at your house," Martinez stated that he and Lindsay "got into an argument, and I said f*** this I'm out of here * * *."

Following the state's case-in-chief, defense counsel introduced an exhibit—a photograph of the back seat of Lindsay's car when it was discovered by the New Hampshire State Police in the rest area. Defense counsel then rested. After several hours of deliberations, a Kent County Superior Court jury returned a verdict finding Martinez guilty of both first-degree murder and driving a motor vehicle without the consent of the owner.

---

[11] Anna testified that the writing on the card was, in fact, Lindsay's handwriting.

After this verdict, the trial justice instructed the jury to decide whether the state had proved beyond a reasonable doubt that Martinez's murder of Lindsay involved either aggravated battery or torture.[12] In his instructions to the jury, the trial justice defined aggravated battery as "the malicious causing of bodily harm to a victim while that victim was still alive by seriously disfiguring the body of that person * * *." The trial justice also instructed the jury that torture "requires evidence of serious physical or mental abuse of the victim while that victim was still alive and conscious." After further deliberation, the jury found that the murder was committed with both aggravated battery and torture to Lindsay. Thereafter, Martinez moved for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. The trial justice denied that motion.

Based on § 12-19.2-1, the trial justice then conducted a presentence hearing, at which the Attorney General and the defense were permitted "to present additional evidence relevant to a determination of the sentence." At this hearing, defense counsel presented the testimony of Ronald M. Stewart, M.D., an experienced clinical and forensic psychiatrist. Doctor Stewart testified that he had recently interviewed Martinez at the ACI in the presence of a social worker. He then issued a ten-page report of his findings to the court.

Doctor Stewart testified that he reviewed Martinez's personal background, which was shaped by a history of abuse at the hands of his father, as well as a traumatic experience in the Navy. After reviewing his personal history and also conducting an interview with Martinez, Dr. Stewart diagnosed Martinez with "[p]ost-traumatic stress, chronic major depressive disorder, and panic disorder, [and] also alcohol abuse disorder." He testified that Martinez was "very

---

[12] General Laws 1956 § 11-23-2 permits a trial justice to impose a sentence of life imprisonment without the possibility of parole based on the jury's finding that either of these two elements was present.

- 12 -

intelligent, very insightful and very contrite regarding his crime, very remorseful about it, and would work diligently to try to repair the damage to himself." He opined that, with prescribed medication and counseling, Martinez's condition would "[c]ertainly" improve, such that he could be "rehabilitated" and could "abide by the norms of society." Moreover, Dr. Stewart testified that, in his opinion, Martinez "would not be a recidivist" if paroled to society after serving a lengthy term in prison.

On cross-examination, Dr. Stewart acknowledged that, in formulating his psychiatric opinion of Martinez, he had taken into consideration Martinez's history of domestic violence. However, he testified that he did not review the videotape Martinez made of himself shortly after murdering Lindsay.

Martinez also addressed the court at this hearing. In significant part, he stated:

> "I take full responsibility for the murder of Lindsay Ann Burke. I am truly and sincerely sorry for my lack of self-control on that morning. * * * I'm so sorry for causing this horrible nightmare. I'll be the first person to tell you that Lindsay did not deserve to die. * * * From the bottom of my heart and all sincerity, I'm so sorry for causing * * * all this pain."

After considering Dr. Stewart's report, the presentence report, the arguments of counsel, the statement from Martinez, victim impact statements from Lindsay's family, as well as letters from friends and the Rhode Island Coalition Against Domestic Violence, the trial justice concluded that "the nature and consequences of this vile, heinous and completely unnecessary unjustified slaying merits a sentence of life [imprisonment] without the possibility of parole * * *."

The trial justice articulated the following findings in his sentencing. "Lindsay was alive through much of the attack on her person in the bathroom and was able to experience and feel the infliction of these wounds up to the time of the fatal slashes which took her life." Moreover, the

- 13 -

trial justice referred to the testimony of Det. Williams in finding that the blood spatter patterns in the bathroom showed that Lindsay "fought ferociously to defend herself during the assault."

With respect to torture, the trial justice found that "[t]he horror that Lindsay Ann Burke experienced at the hands of this defendant which she had to endure for some minutes before her ultimate death while futilely fighting for her survival clearly constitutes torture of the cruelest nature." He further found that "[Lindsay's] enduring the multiple abrasions, punctures, stab wounds and slashing has manifestly shown aggravated battery in the inordinate number of wounds she experienced while being in a conscious state."

Further, the trial justice found that "[a]ny mitigation accruing to the defendant because of his age, his military service and lack of prior criminal record are subsumed in his lack of true remorse or acceptance of responsibility * * * of his actions." The trial justice characterized Martinez's anger, alleged lack of sleep, and medical status as "shallow attempts to blame others" for what he had done. He stated that Martinez's potential for rehabilitation "is extremely poor," especially in light of the domestic abuse he had previously imposed on the mothers of his two children. He further noted that domestic violence "continue[s] to increase and the rate of recidivism among perpetrators, in this [c]ourt's view, is nothing short of alarming." With that in mind, he stated that "[t]his sentence ought to clearly be a deterrent to others who may be similarly situated * * *," although he acknowledged that the court "doubt[ed] its effectiveness or ability to curb or lessen these criminal activities."[13]

---

[13] As a result of efforts undertaken by Lindsay's family and other domestic violence awareness advocates after her murder, the General Assembly enacted the Lindsay Ann Burke Act, which is aimed at preventing and addressing dating violence in all of the state's school districts. See G.L. 1956 § 16-85-2, as enacted by P.L. 2007, chs. 287, 490.

The trial justice sentenced Martinez to life imprisonment without the possibility of parole for Lindsay's murder, and to five years concurrent time in prison for the motor vehicle offense. Martinez then timely appealed to this Court.

## II

## Issues on Appeal

Martinez advances three arguments to support his appeal. First, Martinez challenges the trial justice's admission of certain testimony from two witnesses: Barrett and Baxter. Specifically, he avers that their testimony about his alleged prior abuse of Lindsay was inadmissible under Rule 404(b). Secondly, Martinez challenges the trial justice's denial of his motion for a new trial. He contends that the jury was wrong in concluding that the homicide amounted to murder in the first degree rather than murder in the second degree. Lastly, Martinez maintains that his sentence of life imprisonment without the possibility of parole was unwarranted. Martinez urges this Court, in the event we uphold his conviction, to reduce his sentence to life imprisonment with the possibility of parole.

In countering Martinez's contentions, the state argues that the trial justice properly admitted the Rule 404(b) testimony since it related to Martinez's intent and motive, which are both permissible purposes under that rule. The state also argues that the trial justice properly denied Martinez's motion for a new trial, pointing out that the trial justice adequately explained his reasons for agreeing with the jury's verdict and validly determined that there was sufficient evidence to support the intent necessary for murder in the first degree. Lastly, the state maintains that the trial justice was justified in imposing the sentence of life imprisonment without the possibility of parole.

# III

## Discussion

### A

### Admissibility of Rule 404(b) Evidence

We have long held that "decisions concerning the admissibility of evidence are 'within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent.'" State v. Gaspar, 982 A.2d 140, 147 (R.I. 2009) (quoting State v. Mohapatra, 880 A.2d 802, 805 (R.I. 2005)).

Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." However, the rule permits such evidence when offered "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident * * *." Id. This Court has consistently stated that the list of admissible purposes contained within this rule provides "examples, rather than a complete enumeration, of permitted purposes." State v. Ciresi, 45 A.3d 1201, 1213 (R.I. 2012) (quoting State v. Rodriguez, 996 A.2d 145, 150 (R.I. 2010)).

Thus, Rule 404(b) operates to exclude evidence of a defendant's "prior crimes, wrongs, or acts * * * to prove that the accused has a criminal disposition and, therefore, is more likely to have committed the crime for which he [or she] stands accused * * *." Rodriguez, 996 A.2d at 151 (citing State v. Graham, 941 A.2d 848, 861 (R.I. 2008)). However, "that rule does not 'require exclusion of otherwise legally probative evidence simply because such evidence might also suggest past criminal activity.'" State v. Garcia, 743 A.2d 1038, 1051 (R.I. 2000) (quoting State v. Gordon, 508 A.2d 1339, 1348 (R.I. 1986)). We have long held that evidence of prior

bad acts is admissible "if such evidence has 'independent relevance in respect to the proof of an element material to the chain of proof of the crime in issue.'" Id. at 1052 (quoting State v. Acquisto, 463 A.2d 122, 128 (R.I. 1983)).[14]

Here, Martinez contends that the trial justice erred in admitting certain testimony offered by both Barrett and Baxter pertaining to his alleged prior abuse of Lindsay. He maintains that such evidence was strictly propensity evidence and that therefore, its admission violated Rule 404(b). The state maintains that this testimony was properly admitted because it related to Martinez's intent and motive and provided the jury with the complete story of the circumstances surrounding the murder. The state argues that this evidence belies the theory of second-degree murder proffered by the defense.

Martinez articulated a similar argument at the pretrial hearing on his motion in limine to exclude such evidence. The state countered that exclusion of testimony relating to Martinez's prior abuse would cause the jury to view the evidence of Lindsay's murder in a "vacuum" and wrongly conclude that this was a "rare instance" in which Martinez "snapped" and "acted on his emotions."

We recognize that "[t]he line between Rule 404(b) evidence presented for the impermissible purpose of demonstrating propensity and Rule 404(b) evidence presented for one of the specific non-propensity exceptions is 'both a fine one to draw and an even more difficult one for judges and juries to follow.'" Rodriguez, 996 A.2d at 150 (quoting State v. Brown, 900

---

[14] This Court has held that in cases involving sexual assault, a trial justice must also determine whether the Rule 404(b) evidence is "'reasonably necessary' for the prosecution to carry its burden of proof." State v. Ciresi, 45 A.3d 1201, 1213 n.12 (R.I. 2012) (quoting State v. Mohapatra, 880 A.2d 802, 806 (R.I. 2005)). However, in cases involving non-sexual crimes, such as those at issue here, "only independent relevance must be shown and the reasonable-necessity requirement is not a condition precedent to the introduction of such evidence." Id. (quoting State v. Garcia, 743 A.2d 1038, 1052 n.10 (R.I. 2000)).

A.2d 1155, 1160 (R.I. 2006)). "However difficult the task, the trial justice must exercise his or her sound discretion in fixing that line and deciding whether this type of evidence should be admitted, excluded, or limited." Ciresi, 45 A.3d at 1211 (quoting State v. Dubois, 36 A.3d 191, 200 (R.I. 2012)). In deciding whether the trial justice abused his or her discretion in admitting the Rule 404(b) testimony, "we look to the trial justice's reasons that underlie the ruling." Dubois, 36 A.3d at 200.

After a carefully measured and thoughtful analysis, the trial justice concluded that some of the Rule 404(b) testimony would be necessary for the jury to decide whether the state was able to prove beyond a reasonable doubt that Martinez had the requisite intent for first-degree murder. Expressing a "very deep concern about the volatility of this type of testimony when exposed to a jury," the trial justice stated that any admitted Rule 404(b) evidence "must be extremely detailed and curtailed by the prosecution to elicit only the nearest minimum testimony necessary * * *."

Although the trial justice did not allow the state to introduce all of the requested Rule 404(b) testimony into evidence,[15] he did allow the state to introduce testimony from Baxter and Barrett about direct communications from Lindsay concerning specific instances of physical abuse by Martinez. He stated that this evidence would be "appropriate for the jury to consider[,] if they think it's important[,] * * * whether or not this defendant may have formed the intent necessary to be convicted [of] first-degree murder[,] and for no other purpose." Aware that

---

[15] The trial justice precluded Anna from testifying about any type of abuse that Lindsay suffered at the hands of Martinez on the basis that Lindsay did not speak directly to Anna about such abuse. The trial justice also excluded a letter written by Lindsay and addressed to Martinez, in which she referred to enduring Martinez's abuse. The letter was unspecific about whether the abuse was physical or emotional. The trial justice determined that, "in light of the fact that the [c]ourt is going to admit [other] [Rule] 404(b) evidence," the letter "[was] manifestly less relevant." As such, the trial justice ruled that the letter was inadmissible.

defense counsel sought to convince the jury that the evidence amounted to second-degree murder, supported by Martinez's statement that he "snapped," the trial justice determined that the Rule 404(b) testimony was "reasonably appropriate" for the jury to consider. According to the trial justice, the Rule 404(b) testimony wove into the "fabric of the fact pattern" leading up to the murder and therefore should not be excluded.

Additionally, the trial justice considered the Rule 404(b) evidence in conjunction with Rule 403 of the Rhode Island Rules of Evidence, which states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The trial justice determined that "while prejudicial [to Martinez,] [the Rule 404(b) evidence] does not in any regard outweigh the probative value of the information to the jury."

Further, with respect to any other Rule 404(b) testimony that the state sought to introduce, the trial justice cautioned that "the [c]ourt is going to be extremely, extremely guarded as to the nature and extent of the testimony that it will allow with regard to [Martinez's alleged abuse against Lindsay]." At trial, the state did not introduce any Rule 404(b) testimony other than that offered by Barrett and Baxter.

Furthermore, the trial justice issued limiting instructions to the jury directly following the testimony of both Barrett and Baxter, as well as a third time at the close of the case.[16] We note

---

[16] After first explaining to the jurors that they were not to consider the Rule 404(b) evidence as propensity evidence, the trial justice instructed the jurors that they could consider such evidence "if [they] think it's important," and "if it tends in [their] mind[s] to establish possible motive, intent, or the absence of mistake * * *" in this case. Further, he stated that the jurors could consider the evidence to determine whether "the defendant had formed a specific intent to commit the crimes charged in this case or to show that the defendant acted knowingly and

- 19 -

that "the members of the jury are presumed to follow the trial justice's instructions." State v. Clark, 754 A.2d 73, 80 (R.I. 2000) (quoting State v. LaRoche, 683 A.2d 989, 1000 (R.I. 1996)).

Mindful of our deferential standard of review with respect to the trial justice's decision to admit the Rule 404(b) testimony at issue, along with his careful analysis based on Rule 403, we cannot say that the trial justice erred in admitting such testimony for the limited purpose of demonstrating Martinez's intent.[17]

**B**

**Denial of Motion for a New Trial**

This Court will leave a trial justice's ruling on a motion for a new trial undisturbed if he or she has "'articulated an adequate rationale for denying' the motion * * *, and has not misconceived or overlooked material evidence * * *." State v. Staffier, 21 A.3d 287, 291 (R.I. 2011) (quoting Rodriguez, 996 A.2d at 149).

It is well settled that "[w]hen ruling on a motion for a new trial, the trial justice acts as a thirteenth juror, exercising 'independent judgment on the credibility of witnesses and on the weight of the evidence.'" State v. Heredia, 10 A.3d 443, 446 (R.I. 2010) (quoting State v. Imbruglia, 913 A.2d 1022, 1028 (R.I. 2007)). In so doing, "the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result

---

willingly * * *." Because defense counsel did not object to these instructions at trial, they are not subject to our review on appeal.

[17] We further note that the jury was fully aware of the content of Martinez's suicide note, in which he stated that Lindsay "stopped [him] from killing Diane." This may have been damaging evidence to Martinez. However, defense counsel did not object to its admission on any grounds, including Rule 404(b) or Rule 403 of the Rhode Island Rules of Evidence. Therefore, we deem this issue waived on appeal.

different from that reached by the jury." Staffier, 21 A.3d at 290 (quoting Heredia, 10 A.3d at 446).

If, after conducting this analysis, "the trial justice agrees with the jury's verdict, the inquiry is complete and the motion for a new trial should be denied." Staffier, 21 A.3d at 290 (citing State v. Morales, 895 A.2d 114, 121 (R.I. 2006)). Conversely, if the trial justice disagrees with the jury's verdict, he or she must then "determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice. If the verdict meets this standard, then a new trial may be granted." Id. at 290-91 (quoting State v. Guerra, 12 A.3d 759, 765–66 (R.I. 2011)).

On appeal, Martinez avers that the trial justice was clearly wrong in denying his motion for a new trial. Martinez does not dispute that the state's evidence was sufficient to convict him of second-degree murder; rather, he argues that the evidence was insufficient to convict him of first-degree murder. According to Martinez, "reasonable minds could not differ" in reaching a conclusion that this was murder in the second degree. According to Martinez, the evidence shows that the murder was "not an act of willful deliberation," but rather a "crime of passion." To support this argument, Martinez highlights certain portions of his suicide note and his videotaped confession, in which he states that he "snapped," "went crazy," and that "rage * * * just filled [him] in a split second to make [him] do what [he] did * * *." As Martinez argued in his motion for a new trial, he maintains on appeal that "it is a fair inference * * * that he went through Lindsay Burke's purse, saw the photographs and/or love letters, became very enraged or upset, walked in, saw her and committed this dastardly act"—a scenario that, in his view, squarely constitutes second-degree murder.

Section 11-23-1 defines murder as "[t]he unlawful killing of a human being with malice aforethought * * *." That same statute defines first-degree murder as, among other things, "[e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing * * *." Id. "Any other murder is murder in the second degree." Id. Thus, the statute provides that malice aforethought is a requisite element of both first-degree and second-degree murder.

Malice aforethought is tantamount to "malice, either express or implied." State v. Texieira, 944 A.2d 132, 142 (R.I. 2008). It is well settled that "[l]egal malice can arise from either an express intent to kill or to inflict great bodily harm or from a hardness of the heart, cruelty, wickedness of disposition, recklessness of consequence, and a mind dispassionate of social duty." Id. (quoting State v. McGranahan, 415 A.2d 1298, 1302 (R.I. 1980)). Furthermore, "[m]alice aforethought 'consists of an unjustified disregard for the possibility of death or great bodily harm and an extreme indifference to the sanctity of human life.'" Id. (quoting McGranahan, 415 A.2d at 1302).

This Court has consistently held that "[t]he distinction between murder in the first degree and murder in the second degree is that murder in the first degree requires premeditation." Texieira, 944 A.2d at 142 (quoting State v. Vorgvongsa, 692 A.2d 1194, 1196 (R.I. 1997)). Thus, in order to establish first-degree murder, "the state [must] prove beyond a reasonable doubt [that] a premeditated intent to kill of more than a momentary duration [existed] in the mind of the accused * * *." Id. at 142 (quoting State v. Parkhurst, 706 A.2d 412, 421 (R.I. 1998)). "[F]irst-degree murder requires the formation of 'an intent to kill for a period more than momentarily prior to the killing itself.'" Id. (quoting Vorgvongsa, 692 A.2d at 1196). Conversely, the offense of second-degree murder, which does not require any premeditation,

"involves a fleeting intent that is contemporaneous with the murder." State v. Gillespie, 960 A.2d 969, 977 (R.I. 2008). As such, second-degree murder is established when the "formation of the intent to kill is merely momentary." Parkhurst, 706 A.2d at 421.

This Court has held that, if a defendant harbors an intent to kill for more than a mere moment, the jury may rightly return a verdict of first-degree murder. See Gillespie, 960 A.2d at 977. The duration of the defendant's intent to kill therefore determines, in part, whether the murder falls into the category of first or second degree. See State v. Ros, 973 A.2d 1148, 1161 (R.I. 2009).

In denying Martinez's motion for a new trial, the trial justice found that the jury's verdict was "supported by reasonable, competent evidence." After carefully reviewing the witnesses' testimony, the medical examiner's report, and the nature and extent of the wounds Lindsay suffered, the trial justice concluded that there was "no doubt" that Lindsay "put up a battle, fighting for her life" for "more than a mere moment." Noting that there were "at least two instances of activity that drew blood in this case"—in the living room and the bathroom, "which was terribly full of [Lindsay's] * * * blood,"—the trial justice determined that "[the] assault took time, there was a definite struggle, and during the course of that battle certainly more than enough time elapsed to allow the defendant to form the intent to kill."

The trial justice acknowledged that the jury had the "very difficult task" of determining whether Martinez had engaged in premeditation, a necessary element of first-degree murder. He noted that the jury could have reached a verdict of second-degree murder. However, based on the trial justice's own "independent evaluation [of] the physical, testimonial and circumstantial evidence in this case," he concluded that "more than a mere moment" had elapsed during the commission of Martinez's "terrible assault" on Lindsay. Accordingly, the trial justice agreed

- 23 -

with the jury's verdict, finding that the evidence was sufficient to convict Martinez of first-degree murder.

As defense counsel observes in her brief to this Court, "[a] specific intent to kill can be inferred from the nature of the killing." Ros, 973 A.2d at 1162. Here, the evidence shows that Lindsay's murder took time to complete. The medical examiner testified that Lindsay was alive for the duration of the assault; and, even after the fatal wound was inflicted, her death was not instantaneous.[18] The evidence overwhelmingly shows that this terrible struggle lasted for more than a mere moment—which is time enough for Martinez to have premeditated his heinous murder of Lindsay.

Moreover, we point out that defense counsel was not precluded from arguing to the jury—and, in fact, did argue—that the element of premeditation was absent from this murder. During his closing argument, defense counsel argued that, upon finding the shirtless photo of Barrett in Lindsay's purse, Martinez was "unable to control his emotions" and "los[t] it for a short period of time." Defense counsel further proffered that Martinez was dejected when he found the photograph linking Lindsay to the heart of another man. Martinez, then, just "snapped." The jury, however, rejected this argument. As the trial justice indicated in denying Martinez's motion for a new trial, defense counsel merely "suggest[ed] a set of inferences in his argument," which the jury was free to accept or reject.

We emphasize that both the state and defense counsel had ample opportunity to present to the jury their respective versions of what transpired during the murder. The jurors, as fact-finders, were then charged with the formidable task of deciding whether the state had proved the element of premeditation beyond a reasonable doubt. We discern no error with respect to the

---

[18] See note 9, supra.

trial justice's charge to the jury on both first-degree and second-degree murder, and we note that Martinez does not challenge this jury charge on appeal. We conclude that the trial justice was correct in determining that the jury "did what [he] asked them to do[,] which was to make findings of fact based on the law * * *." Accordingly, we hold that the trial justice did not err in denying defendant's motion for a new trial.

## C

### Sentence of Life Imprisonment Without the Possibility of Parole

We cannot overstate the gravity of a sentence of life imprisonment without the possibility of parole. It "is the most severe sentence authorized by Rhode Island law." State v. Carpio, 43 A.3d 1, 13 (R.I. 2012) (citing State v. Tassone, 749 A.2d 1112, 1121 (R.I. 2000)). This Court has consistently stated that "the sentence of life imprisonment without the possibility of parole is reserved for those who commit a 'narrow class of the most heinous crimes.'" State v. Sifuentes, 996 A.2d 1130, 1135 n.10 (R.I. 2010) (quoting State v. Brown, 898 A.2d 69, 86 (R.I. 2006)).

"Under * * * § 11-23-2, the 'sentence of life imprisonment without the possibility of parole may be imposed in a first-degree murder case when one of seven enumerated grounds is present.'" Sifuentes, 996 A.2d at 1135-36 (quoting State v. Motyka, 893 A.2d 247, 288 (R.I. 2006)).[19] In deciding whether to impose a sentence of life imprisonment without the possibility

---

[19] Section 11-23-2 provides as follows:

> "Every person guilty of murder in the first degree shall be imprisoned for life. Every person guilty of murder in the first degree: (1) committed intentionally while engaged in the commission of another capital offense or other felony for which life imprisonment may be imposed; (2) committed in a manner creating a great risk of death to more than one person by means of a weapon or device or substance which would normally be hazardous to the life of more than one person; (3) committed at the direction of another person in return for money or any other thing of monetary value from that person; (4) committed in a manner

of parole, the trial justice must also "consider evidence regarding the nature and circumstances of the offense and the personal history, character, record, and propensities of the defendant which are relevant to the sentencing determination." Section 12-19.2-4. Additionally, in carrying out the heavy responsibility of sentencing a defendant, this Court has directed the trial justice to consider "(1) the severity of the crime, (2) the defendant's personal, educational, and employment background, (3) the potential for rehabilitation, (4) the element of societal deterrence, and (5) the appropriateness of the punishment." State v. Tiernan, 645 A.2d 482, 484 (R.I. 1994).

This Court reviews a trial justice's sentence of life imprisonment without the possibility of parole in a de novo manner. Sifuentes, 996 A.2d at 1135 (citing Motyka, 893 A.2d at 288). In doing so, we must "exercise [our] own independent judgment and discretion in determining the appropriateness of the sentence." State v. Quinlan, 921 A.2d 96, 111 (R.I. 2007) (quoting Tassone, 749 A.2d at 1119). As such, we "don the robes of a trial justice" and examine "the record, the jury's findings, the trial justice's conclusions, and the character and propensities of the defendant, including any aggravating circumstances as well as any mitigating factors." State v. McManus, 941 A.2d 222, 235 (R.I. 2008) (quoting Quinlan, 921 A.2d at 111-12).

involving torture or an aggravated battery to the victim; (5) committed against any member of the judiciary, law enforcement officer, corrections employee, assistant attorney general or special assistant attorney general, or firefighter arising from the lawful performance of his or her official duties; (6) committed by a person who at the time of the murder was committed to confinement in the adult correctional institutions or the state reformatory for women upon conviction of a felony; or (7) committed during the course of the perpetration or attempted perpetration of felony manufacture, sale, delivery or other distribution of a controlled substance * * * shall be imprisoned for life and if ordered by the court pursuant to chapter 19.2 of title 12 that person shall not be eligible for parole from imprisonment." (Emphasis added.)

Furthermore, after considering the transcripts of the lower court proceeding, this Court "may, in its discretion, ratify the imposition of the sentence of life imprisonment without [the possibility of] parole or may reduce the sentence to life imprisonment." Section 12-19.2-5.

Thus, in resolving whether the trial justice was justified in imposing a sentence of life imprisonment without the possibility of parole, this Court must "embark on a thorough, independent review of the record" to determine whether the murder was committed with aggravated battery or torture. McManus, 941 A.2d at 235. Additionally, we must also consider Martinez's character and propensities to determine whether it is probable that he will be rehabilitated. See Sifuentes, 996 A.2d at 1138.

Here, the jury found that Martinez had committed murder in the first degree, and also found that the murder involved both aggravated battery and torture. We note that, although the jury found that the murder was committed with both aggravated battery and torture, only one of these factors would have sufficed for Martinez to be eligible for a sentence of life imprisonment without the possibility of parole.[20]

This Court has explained that "the terms torture and aggravated battery are words of common usage." McManus, 941 A.2d at 236 (citing State v. Travis, 568 A.2d 316, 323 (R.I. 1990)). We have stated that the term "aggravated battery * * * convey[s] to a juror of ordinary intelligence an image of a beating or infliction of traumatic force that is greater than necessary in order to render a victim helpless or to subject the victim to the will of the aggressor." Travis, 568 A.2d at 323. The term "torture * * * convey[s] a similar meaning of inflicting pain and

---

[20] We further note that, in her oral argument to this Court, defense counsel conceded that the murder involved both aggravated battery and torture. Defense counsel, therefore, focused her argument on the second prong of this Court's review of a sentence of life imprisonment without the possibility of parole—the likelihood that Martinez could be rehabilitated.

traumatic force beyond that which would ordinarily be expected even in the case of homicide." Id.

Based on our measured and independent review of the record, which included viewing gruesome photographs of Lindsay's body after the murder, we conclude that the evidence in this case overwhelmingly illustrates that the murder involved both aggravated battery and torture. We agree with the trial justice that "[t]he horror that Lindsay * * * experienced at the hands of this defendant which she had to endure for some minutes before her ultimate death while futilely fighting for her survival clearly constitutes torture of the cruelest nature." Likewise, we agree with the trial justice that "[Lindsay's] enduring the multiple abrasions, punctures, stab wounds and slashing has manifestly shown aggravated battery in the inordinate number of wounds she experienced while being in a conscious state." Lindsay was savagely beaten, while trying to defend herself to save her life. Even when Martinez dealt her the final, fatal blow, Lindsay did not die instantly. Instead, she remained alive for some time before her untimely passing. [21]

After independently determining that Lindsay's murder involved aggravated battery and torture, we now proceed to determine whether Martinez's character and propensities warrant the imposition of the sentence of life imprisonment without the possibility of parole. See McManus, 941 A.2d at 238. In so doing, this Court looks to "any aggravating circumstances as well as any mitigating factors." State v. Lopez, 45 A.3d 1, 24 (R.I. 2012) (citing State v. Mlyniec, 15 A.3d 983, 1000 (R.I. 2011)).

In his brief to this Court, Martinez beseeches us to compare the facts of this case with the facts of other cases in which we have upheld a sentence of life imprisonment without the possibility of parole. He argues that these other cases involved more heinous murders. We

---

[21] See note 9, supra.

decline his invitation to engage in the task of deciding which facts ultimately shock us the most. Rather, we look at the facts of this case alone in deciding whether the sentence is appropriate and justified. See State v. Washington, 581 A.2d 1031, 1035 (R.I. 1990); see also McManus, 941 A.2d at 237 ("There may have been more heinous, more gory, and more brutal murders in this state, but this Court will not attempt to weigh the degree of atrocity associated with each murder.").

Defense counsel also urges this Court to give great weight to Dr. Stewart's testimony at the presentence hearing. Through his testimony, we learned that Martinez graduated from a vocational high school program in Cranston, where he participated in soccer and wrestling. Martinez then honorably served in the United States Navy for five years, during which he received military honors. After his honorable discharge in 2001, he gained employment as a civilian radar technician and also purchased a home. He is the father of two young children, and he did not have a criminal record prior to this murder.

As a young child, Martinez was the victim of domestic abuse inflicted by his father. He was also sexually molested by various babysitters. Additionally, his service in the Navy was traumatic. Upon his discharge, he sought counseling, and was treated with medication, which he tended to overtake. He abused alcohol, and suffered nightmares about his military experiences. As a result of his nightmares, he was able to sleep only two to three hours per night.

At the hearing, Dr. Stewart testified that after interviewing Martinez at the ACI, he concluded that Martinez was "very intelligent, very insightful and very contrite regarding his crime, very remorseful about it, and would work diligently to try to repair the damage to himself."

Doctor Stewart diagnosed Martinez with post-traumatic stress, chronic major depressive disorder, panic disorder, and alcohol abuse disorder. According to Dr. Stewart, these diagnoses "could all cause [Martinez] to act impulsively[,] to have [a] somewhat marginal understanding of what he was doing, [and] to not behave rationally at times."

Doctor Stewart was "reasonably certain" that Martinez could be rehabilitated and "abide by the norms of society" with prescribed medication and counseling. He further testified that the medication and counseling necessary for Martinez to be rehabilitated would be available to him at the ACI. Doctor Stewart did not believe that Martinez would be a recidivist if paroled to society after serving a lengthy prison term.

On cross-examination, Dr. Stewart acknowledged Martinez's lengthy history as a violent domestic abuser, testifying that Martinez was "no stranger to domestic abuse." He acknowledged that Martinez had "forced [his former wife] to perform oral sex upon him and [had] kicked her in the head with a steel-toed boot." He further acknowledged on cross-examination that he was aware of other occasions on which Martinez had engaged in domestic violence, including an incident when he forced his young son to stay on his knees for extended periods of time while Martinez yelled obscenities close to his son's face. He stated that there is a "terrible disconnect"—"a type of Dr. Jeckel [sic] and Mr. Hyde type thing where we have a monster one minute and then some point afterward, it gets resolved, and they say, 'My God, what did I do?'" Doctor Stewart also acknowledged that "[d]omestically abused people who become abusers themselves without adequate treatment[—]long-term treatment[—]tend to [abuse] again * * *."

In rendering his diagnosis and psychological opinion about the likelihood that Martinez could be rehabilitated, Dr. Stewart admitted on cross-examination that he did not review the

videotape that Martinez made of himself shortly after murdering Lindsay. Thus, at the time he rendered his report, Dr. Stewart was not familiar with Martinez's demeanor in the immediate aftermath of the murder. Notwithstanding that, on redirect examination, Dr. Stewart testified that this new information would not change his opinion that Martinez would not be a recidivist.

Defense counsel also emphasizes Martinez's testimony at the presentence hearing. In his allocution, Martinez stated:[22]

> "* * * I * * * take full responsibility for the murder of Lindsay Ann Burke. I am truly and sincerely sorry for my lack of self-control on that morning. I respectfully beg for forgiveness from Lindsay's family and friends and bringing shame to my family— for bringing shame in this unfortunate tragedy. Unfortunately it's something that I and everybody else will have to live with, and I'm so sorry for causing this horrible nightmare.
> "I'll be the first person to tell you that Lindsay did not deserve to die. It's not fair that she is dead, and I am still alive.
> "If I could ever switch places with Lindsay, I would in a heartbeat. * * * [I]f I could relive th[at] morning, I would not do what I did to Lindsay * * *."

Additionally, in his statement to the court, Martinez denied ever abusing Lindsay before he killed her.

Defense counsel argues that the testimony from both Dr. Stewart and from Martinez himself demonstrates that Martinez is remorseful, which indicates his ability to be rehabilitated. However, the state contends that Martinez's suicide note, written immediately after murdering Lindsay, suggests otherwise. In this note, Martinez appeared to blame Lindsay, and not himself, for what happened. In the letter, he wrote: "I found out that Linds was talking to someone. * * * [S]o she was cheating on me. * * * She strai[gh]t lie[d] to me." He also appeared to blame other women in his life for the murder, writing that he "had been f***ed over by [too] many

---

[22] Martinez also made statements at the presentencing hearing casting Lindsay and her parents in a negative light.

women." Further, he additionally blamed the murder on "what [he] went through when [he] was a kid, and the amount of time [he] got shot [at] in Kosovo [while in the Navy]." As such, according to the state, Martinez's suicide note deflects blame away from himself, indicating that Martinez is not remorseful.

We further note that, in the presentence report, Martinez is quoted as stating that this was not murder in the first degree. He appeared to attribute blame for the murder on his lack of sleep and failure to take his medication. Additionally, he commented that when he and Lindsay began dating, Lindsay's parents "gave up on her." Because of this, he had to take care of her, which, according to Martinez, proved to them that he was "man enough" to do. He further stated that he felt sorry for Lindsay's parents, since they never had the chance to apologize to her.

"[A] criminal defendant's prospects for rehabilitation should be a major consideration * * * when imposing sentence." State v. Bertoldi, 495 A.2d 247, 253 (R.I. 1985). This Court has stated that the "many factors" involved in this consideration cannot all be "categorized or succinctly described." Id. "These factors concern the defendant's attitude toward society, the remorse or guilt that a defendant may feel for having committed a crime, and his or her willingness and ability to take a place as an honest and useful member of society." Id.

Here, we cannot ignore Dr. Stewart's testimony, especially his opinion that Martinez is capable of rehabilitation after serving a lengthy prison sentence. However, this testimony must be weighed against Martinez's own statements in which he assigns blame for this murder to sources other than himself. Although he has never denied that he committed the murder, he has pointed his finger at Lindsay, other women, his lack of sleep due to nightmares, his military trauma, his abusive father, Lindsay's parents, and his misuse of medication, among other reasons, as scapegoats.

Moreover, although Martinez does not have a prior criminal record, we are not convinced that he is capable of or willing to take a place as an honest and useful member of society. His history as a domestic abuser speaks volumes. During his allocution at the presentence hearing, Martinez denied that he had ever abused Lindsay before the murder. Additionally, in the presentence report, Martinez claimed that the day of the murder was the "one day" on which he failed to "take the high road." These statements clearly show that Martinez had not taken responsibility for the domestic abuse he had inflicted not only upon Lindsay, but also upon two other women, as well as upon his own son.[23] Furthermore, it is also telling that Martinez stated that he will "never understand" why he committed this murder nor "what happened to [him]" on that morning.

After carefully considering the record and exercising our own independent judgment and discretion, we are not persuaded to reduce Martinez's sentence. Any mitigating factors, such as Martinez's employment, lack of criminal record, young age, and honorable military service are far outweighed by the aggravating factors present in this case. Martinez viciously assaulted and murdered Lindsay, a woman whom he claims to have loved. He has failed to accept the entirety of the blame for her utterly senseless death. He has even failed to acknowledge and take responsibility for his own violent propensities with respect to other women he had relationships with. We therefore remain convinced that this terrible crime warrants the imposition of a sentence of life imprisonment without the possibility of parole. Accordingly, we affirm the sentence imposed by the trial justice.

---

[23] We note that in his allocution at the presentencing hearing, Martinez did state that he "[took] full responsibility for the murder."

## IV

## Conclusion

For the reasons stated in this opinion, we affirm the judgment imposed by the Superior Court, to which we remand the record in this case.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**   State v. Gerardo E. Martinez.

**CASE NO:**   No. 2008-121-C.A.
(K1/05-570A)

**COURT:**   Supreme Court

**DATE OPINION FILED:**   January 23, 2013

**JUSTICES:**   Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ.

**WRITTEN BY:**   Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**   Kent County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Francis J. Darigan, Jr.

**ATTORNEYS ON APPEAL:**

For State:  Virginia M. McGinn
Department of Attorney General

For Defendant:  Catherine Gibran
Office of the Public Defender