# United States Court of Appeals
## For the First Circuit

No. 22-1002

STEVEN WEBSTER,

Petitioner, Appellant,

v.

DEAN GRAY, Superintendent,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Kayatta, Circuit Judges.

Dana A. Curhan for appellant.
Eva M. Badway, Assistant Attorney General, Criminal Bureau,
with whom Maura Healey, Attorney General of Massachusetts, was on
brief, for appellee.

July 8, 2022

**SELYA**, **Circuit Judge**.    In  this  habeas  appeal, petitioner-appellant Steven Webster challenges the sufficiency of the evidence underpinning his Massachusetts convictions for first-degree felony murder and related offenses.   See Jackson v. Virginia, 443 U.S. 307 (1979).  Although the facts, when viewed in isolation, lend a patina of plausibility to this challenge, the whole is sometimes greater than the sum of the parts.  So it is here:  after careful consideration of the evidentiary record as a whole, we find that the state court reasonably applied federal law in deeming the Commonwealth's proof constitutionally adequate and, thus, affirm the district court's denial of the habeas petition.

I

Because this appeal presents "a challenge to evidentiary sufficiency, we rehearse the facts in the light most compatible with the jury's verdict, consistent with record support." Leftwich v. Maloney, 532 F.3d 20, 21 (1st Cir. 2008) (citing Jackson, 443 U.S. at 319).  In conducting this tamisage, we remain mindful that — on habeas review — "a determination of a factual issue made by a State court" is "presumed to be correct."   28 U.S.C. § 2254(e)(1).  This presumption extends to findings made by state appellate courts in the course of direct review.  See Teti v. Bender, 507 F.3d 50, 58 (1st Cir. 2007).  We thus recite the facts that the Massachusetts Supreme Judicial Court (SJC) found could have supported a jury's reasoning, supplemented by other facts in

- 2 -

the record consistent with that recitation.  See Porter v. Coyne-Fague, 35 F.4th 68, 71 (1st Cir. 2022); Companonio v. O'Brien, 672 F.3d 101, 104 (1st Cir. 2012).

Our tale begins on Cape Cod and, more particularly, in the seaside village of Hyannis (an enclave of Barnstable, Massachusetts).  At approximately 1:20 pm on July 11, 2012, Barnstable police officers responded to reports of gunshots at 30 Otis Road — a house abutting a BMW dealership.  See Commonwealth v. Webster (Webster I), 102 N.E.3d 381, 384 (Mass. 2018).  When the officers arrived, the residue of a discharged firearm lingered in the air, and they heard screams and moaning from inside the house.  As the officers approached the house, a man, immediately identified as Keiko Thomas, pulled back a curtain on a window and made eye contact with one of them.  The officers heard more gunshots and a commotion inside the house before seeing Thomas and another man (identified as Eddie Mack) climbing out of a first-floor window at the rear of the property.

Both Thomas and Mack fled, vaulting the fence that separated the property from the BMW dealership.  A third man — later identified as David Evans — also emerged from the house and took flight.  A pursuit ensued.

Thomas and Evans were quickly apprehended.  Mack's arrest transpired not long after:  a canine officer and his dog followed a scent trail to an address one street over from Otis

Road, where they found Mack and detained him.  While most of the officers were in pursuit of this trio, a witness reported seeing a fourth man, not immediately identified, running in the vicinity of the house.

When the police entered the Otis Road dwelling, they were confronted by a grisly scene.  A man, subsequently identified as Andrew Stanley, was face-down in a large pool of blood.  His hands and feet were bound with duct tape and zip ties.[1]  Stanley — who had an apparent gunshot wound surrounded by powder burns on his right side — was later pronounced dead at a local hospital.  An autopsy revealed (in addition to the gunshot wound) evidence of blunt-force trauma to Stanley's face, neck, torso, and extremities together with marks consistent with the application of a stun gun.

The police recovered several items from the site at which they apprehended Mack, including a quantity of marijuana, two cell phones, and $14,300 in cash.  Two other cell phones were discovered nearby.  Three of the recovered cell phones belonged to Stanley, Mack, and Thomas, respectively.  The police also recovered a black backpack from the parking lot adjacent to the house through which Thomas and Evans had fled.  The backpack contained two firearms, including a loaded .45-caliber Colt handgun, gloves, a roll of duct tape, a stun gun, an aerosol can, zip ties, and a black face

---

[1] Subsequent investigation disclosed that there were locked handcuffs underneath the duct tape.

- 4 -

mask.  Testing showed that the face mask bore the petitioner's DNA.

Outside the Otis Road house, the police found a spent shell casing fired from the Colt handgun.  The bullet recovered from Stanley's body was consistent with having been fired from that gun.  Fingerprint and palm print evidence connected Mack to the scene.

The investigation turned up other evidence that tended to link the petitioner to the crime.  The SJC, which upheld the petitioner's convictions on direct appeal, efficiently summarized that evidence[2]:

> Cell phone records showed that, in the days leading up to the killing, Mack, Evans, and the defendant were communicating with one another via calls and text messages.  From July 1 to July 11, the defendant telephoned or sent text messages to numbers associated with Evans 231 times.  On July 3, the defendant sent a text message to Evans that stated, "Got some heat lined up," and "Bring dem rollie up, in the arm rest."  On July 7, the defendant sent another text message to Evans stating, "cuz if you chillen im bout, I am to go snatch my lil heat by Norfolk and cum back."  On July 9, Evans sent a text message to the defendant asking, "So, what about mack?" The defendant responded, "We out their what time was u tryna head out their?" Evans replied, "We gotta see dude at nine tho."  Evans asked the defendant, "What you trying to do?"  The defendant responded, "stressing fam."  The defendant also communicated with Mack seven times on July 10 and July 11.

---

[2]  In its opinion, the SJC consistently referred to the petitioner as "the defendant."

Between July 7 and 11, there were multiple text messages exchanged between Mack and Evans and forty-five communications between Mack and Thomas. On July 8, Mack sent a text message to Evans saying, "Gotta come down so I can explain it better bro so we can get better understandin feel me." The day before the killing, Mack sent another text message to Evans asking, "Yal good?" Evans responded, "Yup. We out there tomorrow night cuz."

Cell site location information (CSLI) evidence placed the defendant's and Mack's cell phones in the Barnstable area on July 10 and 11. CSLI evidence further indicated that both of their cell phones were tracked being moved from Barnstable toward Boston approximately one hour after the homicide. At 2:21 P.M., the defendant telephoned Mack, using a calling feature to block the caller's identification. A few minutes later, a text message was sent from [Evans's phone] to Mack, which stated, "What up bro its [me, (i.e., the defendant)] hit me back." At 4 P.M., cell phones belonging to the defendant and Evans were in the Boston area.

Finally, tire impressions found in the dirt and gravel of the backyard at the scene were consistent with the pattern made by the tires of a Chevrolet Impala automobile that Evans had rented a few days prior to the murder. The vehicle was found in Boston on July 13, approximately one mile from the defendant's home. The defendant's DNA was located on the interior and exterior of the rear passenger's side door of the vehicle.

Webster I, 102 N.E.3d at 385-86 (second alteration in original).

The authorities arrested the petitioner in February of 2013. When he was interviewed following his arrest, he dissembled: he told the police that he had never been to Cape Cod and was not

- 6 -

familiar with Barnstable. Although the petitioner acknowledged knowing Mack, he at first denied knowing Evans. Later, though, he admitted knowing Evans by a street name — but he claimed to have met him only once.

In due course, a Barnstable County grand jury indicted the petitioner and charged him with, inter alia, first-degree murder on a theory of felony murder. See Mass. Gen. Laws ch. 265, § 1. The petitioner was tried alongside Mack — Thomas and Evans having pleaded guilty to various charges. The jury convicted Mack of first-degree murder as well as other offenses. At the same time, the jury convicted the petitioner of first-degree murder on a theory of felony murder based on a predicate of armed robbery. The jury also convicted the petitioner of armed robbery, home invasion, armed assault in a dwelling, and carrying a firearm without a license.[3] See Webster I, 102 N.E.3d at 384. The trial court sentenced the petitioner to a term of life imprisonment on the felony-murder charge and to lesser, concurrent terms of immurement on the other charges. The petitioner appealed.

---

[3] Felony murder is a doctrine that extends murder liability to participants or other coventurers in certain felonies that result in a killing. See Commonwealth v. Rakes, 82 N.E.3d 403, 416 (Mass. 2017). The armed robbery charge was the predicate for the Commonwealth's felony-murder theory and was dismissed after trial, contingent upon the murder conviction begin upheld. See Webster I, 102 N.E.3d at 384 & n.1.

The SJC affirmed the petitioner's convictions. See id. As relevant here, the petitioner argued — as he had argued in the trial court — that he was not present at the scene of the crime, and he challenged the sufficiency of the evidence. Specifically, he argued "that the Commonwealth failed to prove that he was at the victim's home at the time the crimes were committed, or that he was otherwise involved in participating in the joint venture." Id. at 386.

The SJC rejected the petitioner's appeal. In its opinion, the court observed that although the Commonwealth's case was circumstantial, such evidence can be "sufficient to establish guilt beyond a reasonable doubt." Id. at 388 (quoting Commonwealth v. Miranda, 934 N.E.2d 222, 233 (Mass. 2010)). The court went on to conclude that such evidence was sufficient in the petitioner's case. See id. The court's analysis is instructive:

> Here, taken together, the evidence, including the text messages in which the defendant said he was procuring a firearm, the CSLI evidence placing his cell phone in the area of the victim's home on July 11 and tracking it as the defendant made his way from Barnstable to Boston just after the murder, his cell phone silence on the morning of the murder, his attempts to conceal his identity when he contacted Mack using Evans's cell phone after the murder, the fact that Evans could not have driven his rental car back to Boston right after the murder, the condition in which the victim was discovered, and the cash and marijuana recovered, as well as the DNA and the defendant's false statements to police, was sufficient to allow the jury to conclude

- 8 -

that the defendant knowingly participated in a joint venture to commit home invasion, armed assault in a dwelling, armed robbery, and carrying a firearm without a license. The evidence permitted an inference that the victim was killed in the course of the armed robbery, thereby providing sufficient evidence to find the defendant guilty of felony-murder.

Id. (citations and footnote omitted).

The petitioner repaired to the federal district court, seeking federal habeas review. See 28 U.S.C. § 2254. In his petition, he named as the respondent the superintendent of the correctional institution at which he was incarcerated. The petition raised only a single contention: that the petitioner's convictions for felony murder and related offenses did not comport with the requirements of due process limned by the Jackson Court. See Jackson, 443 U.S. at 317-19. The district court denied the petition, holding that the SJC's sufficiency-of-the-evidence determination was not unreasonable. See Webster v. Gray (Webster II), No. 19-11788, 2021 WL 3915005, at *6 (D. Mass. Sept. 1, 2021). The district court then granted a certificate of appealability because — in its view — "jurists of reason could disagree as to whether [the] petitioner demonstrated in his filings that his conviction was based on insufficient evidence." See 28 U.S.C. § 2253(c)(2). This timely appeal followed.

- 9 -

We review de novo a district court's decision to grant or deny a habeas petition brought under 28 U.S.C. § 2254. See Leftwich, 532 F.3d at 23; O'Laughlin v. O'Brien, 568 F.3d 287, 298 (1st Cir. 2009). The beacon by which we must steer is the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1218-19. Under AEDPA, a federal court may not grant habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the state court decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). A state court's factual findings "shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." Id. § 2254(e)(1).

## A

Here, the petitioner claims that there was insufficient evidence to support his conviction under a felony-murder theory as well as his convictions for related offenses. He focuses his briefing on his felony-murder conviction and treats the other counts of conviction as more or less an afterthought, alluding to

- 10 -

them in only a desultory fashion. Given the lack of development, we could deem the challenge to those counts as waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). But inasmuch as the evidence is largely overlapping to the point that all the convictions rise or fall with the armed-robbery and felony-murder convictions, we consider them.

The constitutional benchmark by which sufficiency-of-the-evidence claims are analyzed is clearly established, see Jackson, 443 U.S. at 319, and habeas review of such claims is typically conducted under section 2254(d)(1), see O'Laughlin, 568 F.3d at 298 & n.14.[4] The petitioner mounts his challenge within that framework, arguing that the SJC's decision unreasonably applied the Jackson standard.

Section 2254(d)(1) contains two distinct avenues for relief: the "contrary to" clause and the "unreasonable application" clause. The "contrary to" clause may warrant relief "if the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law or if the state court decides a case differently than th[e Supreme] Court has on

---

[4] It is possible to imagine circumstances in which a sufficiency-of-the-evidence claim could be premised "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see O'Laughlin, 568 F.3d at 298 n.14. Here, however, the petitioner does not argue that any of the facts were unreasonably determined; instead, he argues that — taken in the ensemble — the facts were legally insufficient to ground his convictions.

a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The petitioner has identified no Supreme Court case with "materially indistinguishable facts" that is "contrary to" the SJC's decision. Accordingly, we leave the "contrary to" clause to one side and focus the lens of our inquiry on the "unreasonable application" clause.

The "unreasonable application" clause opens the door for relief "if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Section 2254(d)(1)'s reference to "clearly established Federal law, as determined by the Supreme Court" means "the holdings, as opposed to the dicta, of th[e Supreme] Court's decisions as of the time of the relevant state-court decision." Id. at 412. Those holdings must be reasonably applied but need not be extended. See White v. Woodall, 572 U.S. 415, 426-27 (2014).

The bottom line is that where, as here, "the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion," a federal habeas court must examine the "specific reasons given by the state court and defer[] to those reasons if they are reasonable." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). As we have said, "[r]easonableness is a concept, not a constant." McCambridge v. Hall, 303 F.3d 24, 36

(1st Cir. 2002) (en banc) (quoting United States v. Ocasio, 914 F.2d 330, 336 (1st Cir. 1990)). Helpfully, though, the Court has erected several guideposts in the section 2254(d)(1) context. To warrant relief under the "unreasonable application" clause, the state court's application of Supreme Court precedent "must be objectively unreasonable, not merely wrong; even clear error will not suffice." White, 572 U.S. at 419 (internal quotation marks omitted) (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)). Moreover, the "unreasonable application" clause affords relief "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." Id. at 427 (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)). And in all events, the reasonableness of a state court's application of a rule laid down by the Supreme Court is calibrated to the specificity of the rule: "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

Jackson provides the substantive rule of decision here. That rule requires that — to comport with the constitutional right to due process — a conviction must be supported by sufficient evidence. Jackson, 443 U.S. at 314-24. As the Supreme Court has phrased it, "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof — defined as

- 13 -

evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." Id. at 316. This rule is general in nature and directs an inquiring court to ask a simple question: "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original).

Of course, many states apply their own standards, developed in their case law, rather than directly applying Supreme Court precedent. Such subtle differences, though, do not perforce mean that the state court failed to decide the federal constitutional question on the merits. Rather, "a state-court adjudication of an issue framed in terms of state law may receive section 2254(d)(1) deference so long as the state standard is at least as protective of the defendant's rights as its federal counterpart." Leftwich, 532 F.3d at 23-24. That is the situation here: although the SJC did not cite Jackson when rejecting the petitioner's appeal, the Massachusetts case law on which it relied — primarily its own decision in Commonwealth v. Latimore, 393 N.E.2d 370 (Mass. 1979) — incorporated Jackson's federal constitutional standard. See id. at 374-75. Thus, "we can securely reason that in scouring the record for Latimore error and finding none, the SJC effectively answered the federal constitutional question." Leftwich, 532 F.3d at 24.

**B**

This brings us to the SJC's decision. The SJC evaluated whether there was sufficient evidence to support the conclusion that the petitioner was a co-venturer in the armed robbery that led to the homicide and the other charged offenses. See Webster I, 102 N.E.3d at 386. The petitioner does not dispute that, in order "[t]o warrant a conviction of felony-murder as a joint venturer with armed robbery as the predicate felony, the Commonwealth had to prove that 'the defendant was a joint venturer in an armed robbery and that [the victim's] death occurred in the commission . . . of that [armed] robbery.'" Commonwealth v. Rakes, 82 N.E.3d 403, 416 (Mass. 2017) (internal quotation marks omitted) (last alteration in original) (quoting Commonwealth v. Williams, 60 N.E.3d 335, 343-44 (Mass. 2016)). Nor does the petitioner dispute that — to find him guilty of armed robbery — the Commonwealth had to prove that he "was part of a venture in which at least one of the coventurers was armed with a dangerous weapon," used violence against the victim, "and took the victim['s] property with the intent to steal it." Id.

The petitioner does not suggest either that the SJC garbled these legal principles or that any of the SJC's subsidiary findings of fact were unreasonable. Instead, he suggests that the facts — as found by the SJC — simply do not add up to enough to support his convictions. He argues that the evidence was

insufficient to prove that he was "present at the scene of the crime," as required under one of two tests for Massachusetts joint venture law.[5]  See Commonwealth v. Ortiz, 679 N.E.2d 1007, 1009 (Mass. 1997).  He further argues that the evidence was insufficient to prove that he knowingly participated in the commission of the crime.  We turn next to an appraisal of these arguments.

## C

The SJC reasonably determined that there is evidence from which a rational jury could conclude beyond a reasonable doubt that the petitioner was present at the scene during the commission of the crime.  To begin, physical evidence suggested the petitioner's involvement.  A mask with the petitioner's DNA was found in a backpack near the scene.  The same backpack contained the murder weapon and other items of the type used to bind the

_____

[5] Here, the SJC based its reasoning on the petitioner having been present at the scene and having participated in the crimes. See Webster I, 102 N.E.3d at 386-88.  Withal, the SJC has also made clear that ordinarily it is enough for joint venture liability that a defendant "aids in the commission of a felony, or is an accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed," Ortiz, 679 N.E.2d at 1009 (quoting Mass. Gen. Laws ch. 274, § 2), and that a jury instruction on "the defendant's presence at the scene of a crime in a prosecution proceeding on a joint participation theory" is required "only to the extent that the factor has legal significance," id. at 1010-11; see Commonwealth v. Benitez, 985 N.E.2d 102, 106 & n.6 (2013) (upholding a felony-murder conviction without requiring physical presence when defendant served as lookout for an armed robbery).  Because there is sufficient evidence to support reasonable inferences both of the petitioner's presence and his involvement, we need not delve into this additional theory of guilt.

victim. Tire impressions consistent with the all-weather tires on the Chevrolet Impala that Evans had rented were found at 30 Otis Road; that car was discovered near the petitioner's home in Boston on July 13; and an inspection disclosed the petitioner's DNA on and inside the car.

Next, a witness's statement weighed in favor of a finding that the petitioner was present at the scene. Although only Mack, Evans, and Thomas were apprehended at or near the scene, a witness described a fourth (unidentified) suspect who succeeded in fleeing.

Cell site location information (CSLI) and cell phone communication records tightened the inference of the petitioner's presence at the scene of the crime during the relevant time frame. The petitioner texted extensively with Evans and Mack over the days leading up to the killing. On the morning of July 11, the petitioner did not text the others, but Mack and Evans texted extensively until 12:10 pm, after which there was no cell phone traffic among the four men (Webster, Mack, Evans, and Thomas).

The homicide and the attendant robbery occurred at approximately 1:20 pm. At 2:21 pm — after the other three men had been apprehended — the petitioner called Mack's phone "using a calling feature to block the caller's identification." Webster I, 102 N.E.3d at 385. A few minutes later, he texted Mack from Evans' phone identifying himself and requesting that Mack respond. CSLI

- 17 -

placed the petitioner's phone in the Barnstable area on July 11 and showed both his phone and Evans's phone moving from Barnstable to Boston in the hours immediately after the killing. The SJC reasonably concluded that the CSLI and cell phone communication records, along with the physical evidence, permitted plausible inferences to the effect that "the four coventurers were together at the victim's home at the time of the killing," id. at 387, and that "the [petitioner] and Evans had traveled together to the crime and, after the killing, the [petitioner] fled back to Boston in Evans's vehicle" with Evans's phone in his possession, id.

There was more. When the petitioner was arrested in February of 2013, he told the police that he had never been to Cape Cod, was not familiar with Barnstable, and did not know Evans. All of these statements were demonstrably false. A rational jury reasonably could interpret these apocryphal statements as evidence of consciousness of guilt — evidence that supported a guilty verdict alongside other evidence. See id. at 387-88; see also Commonwealth v. Jones, 77 N.E.3d 278, 289 (Mass. 2017).

That gets the grease from the goose. Drawing on this evidentiary array, the SJC reasonably held that a rational jury could form plausible inferences and find that the petitioner was plotting with the other three men leading up to the killing and was in attendance at 30 Otis Road during the commission of the robbery. The roughly two-hour cessation of communications among

- 18 -

the four men supports an inference that they were all together and, thus, had no need for electronic communication during that interlude. What is more, the petitioner's DNA on the mask, the presence of the mask in the backpack along with the murder weapon, the tire impressions at the scene, the CSLI showing the petitioner's cell phone and Evans's cell phone moving from Barnstable to Boston, the presence of the petitioner's DNA on and inside the car, the discovery of the car near the petitioner's home in Boston,[6] and the petitioner's prevarication to the police combine to provide strong support for a finding that the petitioner was a participant in the venture. Given that picture, we cannot say that the SJC's decision is objectively unreasonable.

The petitioner resists this conclusion. He invites us to focus on each brush stroke in isolation, and he submits that no brush stroke, by itself, establishes his guilt. We decline this invitation: our task is to focus on the totality of the evidence — and here, the brush strokes collectively, paint a compelling picture of the petitioner's complicity in the criminal venture.

---

[6] The distance between the petitioner's home and the spot where the car was recovered appears to have been approximately 1.6 miles. The petitioner does not argue that the SJC erred by including this datum in the mix of facts that it assessed and — in any event — we do not believe that the inclusion of this fact changes the general thrust of the inferences that can reasonably be drawn.

Given that picture, we cannot say that the SJC's decision is objectively unreasonable.

To be sure, the petitioner proffers a number of qualifications, explanations, and purported inconsistencies that might serve to undermine the force of individual pieces of evidence. For instance, he contends that CSLI "do[es] not place his phone in the [cell-tower] sector in which the house was located, meaning that the phone may have been in the Barnstable/Hyannis area but was not at the scene of the crime at the time the crimes were committed." This contention, though, does not get him very far because the house is on the edge of the cell-tower sector that registered his phone and witnesses for both sides acknowledged that CSLI is not absolutely precise. A jury would be well within the bounds of reason to conclude that the CSLI for the petitioner's phone supported an inference that he was at 30 Otis Road at the time of the killing.

The petitioner also argues that phone records show "simultaneous[]" and "overlapping" post-murder communications from cell phones that a jury could infer were his and Evans's, with the implication that it is impossible that he could have been using both phones while driving. As far as we can tell, the petitioner did not make this argument either in the trial court or to the SJC. At any rate, a careful examination of the records shows that they are capable of supporting various inferences. For instance,

a jury might reasonably infer that the allegedly "overlapping" communications were not "simultaneous[]" but, rather, in quick succession.  Or a jury might reasonably infer that, even if the communications were "simultaneous[]," the petitioner was nevertheless driving in the Chevrolet Impala to Boston.  The CSLI related to these calls shows the phones, reasonably attributable to the petitioner and Evans respectively, moving up Route 3 to Boston in tandem.

Other qualifications and explanations — that Mack or Evans could have borrowed the mask without his knowing the borrower's intentions, that the tire impressions found at the scene were consistent with a popular type of all-weather tire, and so on — are even less compelling and recede into insignificance when considered against the bigger picture.  And as we have said, "[t]he sum of an evidentiary presentation may well be greater than its constituent parts."  United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992) (quoting Bourjaily v. United States, 483 U.S. 171, 179-80 (1987)).  This is such a case, and the petitioner's qualifications and explanations, though imaginatively phrased, cannot dispel the probative force of the whole.  Although any one piece of the Commonwealth's evidentiary array — viewed alone — might very well be written off as coincidental, insisting that the SJC write off as coincidental the entire body of evidence that the

Commonwealth had amassed would entail more than the Jackson standard requires.

Against the backdrop of this evidence, the petitioner's assertion that "[n]o one actually saw [him] in or near the scene of the killing" does not take him very far. Eye-witness testimony that a defendant was present at the scene of a crime is not constitutionally required: circumstantial evidence alone may be sufficient to convict, see Miranda, 934 N.E.2d at 233; Cramer v. Commonwealth, 642 N.E.2d 1039, 1042 (Mass. 1994); see also Gomes v. Silva, 958 F.3d 12, 20 (1st Cir. 2020), and circumstantial evidence suffices here to ground a reasonable inference of the petitioner's presence at the scene.

In an effort to change the trajectory of the debate, the petitioner suggests that it would have been implausible for him to have driven the Chevrolet Impala from the scene undetected after police arrived and established a perimeter. This effort fails. The time line is not clear, and with a multitude of officers in hot pursuit of fleeing suspects, it is not unreasonable to infer that the car could have been driven away without being remarked. And regardless of whether the petitioner left the scene before or after the police arrived, a rational jury could conclude that the petitioner was there at some point during the course of the robbery.

The petitioner has a fallback position. He contends that there is insufficient evidence to show that he was involved in the armed robbery and related offenses that led to Stanley's murder. The record refutes this contention.

As we already have noted, the petitioner's cell phone records support an inference that he was in communication with Evans and Mack in planning the robbery. He called or messaged Evans a total of 231 times between July 1 and July 11 and communicated with Mack seven times between July 10 and July 11. Messages sent and received during that interval suggested that the men were planning the robbery. In one revelatory exchange, for example, the petitioner remonstrated that he was "stressing" over what a jury could conclude was the plan. Texts on July 3 and July 7 from the petitioner to Evans discussed obtaining "heat" — a common euphemism for a firearm. See Webster I, 102 N.E.3d at 385-86. A rational jury reasonably could conclude from the messages that the petitioner was hip-deep in planning the robbery and related offenses, had obtained a weapon, and was aware of the potential for violence.

We summarize succinctly. In gauging a sufficiency-of-the-evidence claim, an inquiring court views the facts as a whole, not in splendid isolation. See United States v. Iwuala, 789 F.3d 1, 9 (1st Cir. 2015); United States v. Martin, 228 F.3d 1, 10 (1st Cir. 2000). Considering the totality of the record evidence in

this case, it was objectively reasonable for the SJC to conclude that the Commonwealth had presented sufficient evidence to show, beyond a reasonable doubt, that the petitioner had been a knowing participant in an armed robbery and that Stanley had been killed in the course of that robbery.  In other words, the evidence supports a reasonable inference that the petitioner was a co-venturer who participated in the armed robbery and related offenses that led to Stanley's demise.

We need go no further.  We conclude, "after viewing the evidence in the light most favorable to the prosecution," that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson, 443 U.S. at 319. The SJC's determination that the evidence was sufficient to support the petitioner's convictions was, therefore, a reasonable application of settled law.  The Jackson standard was reasonably applied, and the district court did not err in denying the petitioner's application for habeas relief.

## III

For the reasons elucidated above, the judgment of the district court is


**Affirmed**.