# United States Court of Appeals
## For the First Circuit

No. 23-1023

GERARDO E. MARTINEZ,

Petitioner, Appellant,

v.

WAYNE T. SALISBURY, JR., Interim Director, Rhode Island
Department of Corrections,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Rikelman, Howard, and Kayatta,
Circuit Judges.

Camille A. McKenna, Assistant Public Defender, Appellate
Division, Rhode Island Public Defender, for appellant.
Christopher R. Bush, Assistant Attorney General, with whom
Peter F. Neronha, Attorney General of Rhode Island, was on brief,
for appellee.

November 4, 2025

**HOWARD**, **Circuit Judge**. This appeal from the dismissal of a petition for a writ of habeas corpus challenges Gerardo Martinez's first-degree murder conviction in Rhode Island state court for the 2005 killing of Lindsay Ann Burke. The district court dismissed Martinez's petition but granted a certificate of appealability. See Martinez v. Coyne-Fague, 646 F. Supp. 3d 345, 368 (D.R.I. 2022).

Martinez maintains that his trial counsel was constitutionally ineffective under the framework established in Strickland v. Washington, 466 U.S. 668 (1984). The issue that we confront is whether the Rhode Island court's denial of Martinez's request for state post-conviction relief constituted an "unreasonable application" of Strickland within the meaning of 28 U.S.C. § 2254(d). Because we conclude that it did not, we affirm.

## I.

We presume the post-conviction court's factual findings to be correct when we consider a state conviction on habeas review. See Hensley v. Roden, 755 F.3d 724, 727 (1st Cir. 2014). As such, the facts below are drawn from the Rhode Island Superior Court's post-conviction decision, Martinez v. State, No. KM-2013-0095, 2018 WL 1359478 (R.I. Super. Ct. Mar. 7, 2018), which incorporated the facts as described in Martinez's direct appeal to the Rhode Island Supreme Court, State v. Martinez, 59 A.3d 73 (R.I. 2013).

- 2 -

Additional facts from the record are described later in our analysis.

### A.

Martinez killed Lindsay in September 2005 after they had dated for approximately two years. The evidence at trial established that the relationship had been a troubled one, with Lindsay's supervisor at work testifying about how Lindsay had described to her Martinez's verbal and physical abuse.

On the day of the killing, Martinez and Lindsay had an altercation that began in his living room before escalating in the bathroom. Martinez first punched Lindsay in the nose, an injury which she apparently moved to the bathroom to treat, as evidenced by bloody tissues found in the wastebasket there. Martinez followed her and eventually inflicted the fatal blows with a knife. An autopsy revealed that Lindsay had suffered extensive wounds, including traumatic injuries on her hands, contusions on her skull, and incisions on her neck, chest, and leg. A photo of her new love interest was found in the bathroom sink. Martinez filmed a confession and then drove from his home in Rhode Island to New Hampshire, where he was arrested in Lindsay's car with a suicide note in his possession.

Martinez was represented during the state's prosecution by Attorney Mark Smith. When he first met with Martinez, Attorney Smith had him sign a medical release form. After obtaining

- 3 -

Martinez's medical records, Attorney Smith shared them with Dr. Ronald Stewart, an experienced clinical and forensic psychiatrist. Dr. Stewart conducted an interview with Martinez and subsequently diagnosed him with post-traumatic stress disorder (PTSD) resulting from abuse that he had suffered as a child and his Navy combat experience in Kosovo, among other factors. This diagnosis meant, according to Dr. Stewart, that criminal intent could not be ascribed to Martinez at the time of the killing.

At trial, Smith elected not to call Dr. Stewart as a witness. Instead, the defense took the position that Martinez should be convicted of second-degree murder instead of first-degree murder because the killing had lacked premeditation.

Under Rhode Island law, "[t]he duration of the defendant's intent to kill . . . determines, in part, whether the murder falls into the category of first or second degree." Martinez, 59 A.3d at 89 (citing State v. Ros, 973 A.2d 1148, 1161 (R.I. 2009)); see also R.I. Gen. Laws § 11-23-1 (murder statute). The state must prove beyond a reasonable doubt that "a premeditated intent to kill of more than a momentary duration [existed] in the mind of the accused" in order to establish first-degree murder. Martinez, 59 A.3d at 88 (alteration in original) (quoting State v. Texieira, 944 A.2d 132, 142 (R.I. 2008)); see also State v. Rodriguez, 822 A.2d 894, 909 (R.I. 2003) ("[F]or first-degree murder to exist, premeditation must have existed for more than

- 4 -

just a mere moment."). "Conversely, the offense of second-degree murder, which does not require any premeditation, 'involves a fleeting intent that is contemporaneous with the murder.'" Martinez, 59 A.3d at 88 (quoting State v. Gillespie, 960 A.2d 969, 977 (R.I. 2008)).

Defense counsel seized on the photo of Lindsay's new love interest to argue at trial that Martinez had not committed first-degree murder. Instead, he told the jury, Martinez was a very jealous man and had "snapped" when he found the photo in her purse. The stakes for Martinez were high. First-degree murder in Rhode Island is punishable by life in prison. R.I. Gen. Laws § 11-23-2. And if the jury finds certain aggravating factors, the trial judge has discretion to sentence the defendant to life without parole. Id. § 12-19.2-1. Second-degree murder, on the other hand, is punishable by ten years to life in prison and cannot result in a sentence of life without parole. See id. § 11-23-2.

Smith's strategy was unsuccessful. Martinez was convicted of first-degree murder and received a punishment of life without parole after a sentencing hearing in which Smith did elicit Dr. Stewart's testimony. The Rhode Island Supreme Court affirmed the conviction and sentence on direct appeal. See Martinez, 59 A.3d at 76, 95.

**B.**

In 2013, Martinez sought post-conviction relief in state court, asserting ineffective assistance of counsel. He focused his challenge on Smith's decision to rely on a "no-premeditation" defense, instead of calling Dr. Stewart as a trial witness in support of a diminished capacity defense. The latter defense, if successful, would have reduced Martinez's culpability to voluntary manslaughter and resulted in a punishment of no more than thirty years in prison. See State v. LaCroix, 911 A.2d 674, 679 (R.I. 2006) (providing an overview of the diminished capacity defense); State v. Hockenhull, 525 A.2d 926, 930 (R.I. 1987) ("A defendant's diminished mental capacity reduces the crime of murder to the lesser included crime of voluntary manslaughter."); R.I. Gen. Laws § 11-23-3 (establishing a maximum imprisonment of thirty years for manslaughter). The Rhode Island Superior Court ("the state post-conviction court") held a three-day evidentiary hearing on Martinez's claim. Smith testified at the hearing, as did both a psychotherapist who had treated Martinez in the months before the murder, and a psychologist who had completed a forensic evaluation of Martinez prior to the hearing and had reached a similar conclusion to that of Dr. Stewart.

The state post-conviction court denied Martinez's petition in 2018. See Martinez, 2018 WL 1359478, at *13. Applying the Strickland framework described below, the court held that

Attorney Smith's performance was not constitutionally deficient (and consequently the court did not reach the issue of prejudice). Id. The Rhode Island Supreme Court denied Martinez's petition for writ of certiorari in 2020. His federal habeas petition followed.

## II.

When a state prisoner seeks habeas relief under 28 U.S.C. § 2254 based on a claim of ineffective assistance of counsel, the petitioner can prevail only if he satisfies the requirements of both the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and the Supreme Court's ineffective assistance of counsel framework as established in Strickland. We start with a description of these standards and how they intersect, below.

## A.

As amended by AEDPA, the relevant provision of language of 28 U.S.C. § 2254, which governs this appeal,[1] dictates that:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

---

[1] The "unreasonable application" clause of 28 U.S.C. § 2254(d)(1) quoted here applies to ineffective assistance of counsel claims. See Yeboah-Sefah v. Ficco, 556 F.3d 53, 70 (1st Cir. 2009). Martinez argued as an alternative below that the state post-conviction court's decision was "based on an unreasonable determination of the facts in light of the evidence presented" in violation of § 2254(d)(2). But the district court rejected that contention, see Martinez, 646 F. Supp. 3d at 365-66, and Martinez does not renew it on appeal.

> (1) resulted in a decision that . . .
> involved an unreasonable application
> of[] clearly established Federal law, as
> determined by the Supreme Court of the
> United States[.]

The salient term is "unreasonable application." An unreasonable application of clearly established federal law as determined by the Supreme Court occurs when "the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case." Bebo v. Medeiros, 906 F.3d 129, 134 (1st Cir. 2018) (alteration in original) (quoting White v. Woodall, 572 U.S. 415, 425 (2014)). An "unreasonable application" requires more than mere error: "Even where a state court has misapplied federal law, we will only grant relief to the petitioner 'in cases in which all fairminded jurists would agree that a final state court decision is at odds with the Supreme Court's existing precedents.'" Strickland v. Goguen, 3 F.4th 45, 53 (1st Cir. 2021) (quoting Dorisca v. Marchilli, 941 F.3d 12, 17 (1st Cir. 2019)). Furthermore, "[t]he more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations." Dorisca, 941 F.3d at 17 (first alteration in original) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Under AEDPA, therefore, our task is straightforward. "[W]here, as here, 'the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned

opinion,' [we] must examine the 'specific reasons given by the state court and defer[] to those reasons if they are reasonable.'" Webster v. Gray, 39 F.4th 27, 33-34 (1st Cir. 2022) (third alteration in original) (quoting Wilson v. Sellers, 584 U.S. 122, 125 (2018)).

### B.

The ineffective assistance of counsel framework that the state post-conviction court was tasked with applying flows from the Sixth Amendment's guarantee of the right to counsel and was established by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). A successful Strickland claim requires a showing that "defense counsel's performance was (1) constitutionally deficient and (2) that this deficiency prejudiced [the defendant's] case." Field v. Hallett, 37 F.4th 8, 17 (1st Cir. 2022) (citing Strickland, 466 U.S. at 687)).

With respect to the first prong, an ineffective assistance of counsel claimant must show that "counsel's performance was objectively unreasonable 'under prevailing professional norms.'" United States v. Mercedes-De La Cruz, 787 F.3d 61, 67 (1st Cir. 2015) (quoting Strickland, 466 U.S. at 688). Courts will evaluate the attorney's conduct "from counsel's perspective at the time," with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Rivera v. Thompson, 879 F.3d 7, 12 (1st Cir. 2018)

- 9 -

(quoting Strickland, 466 U.S. at 689). We are also cautioned that "every effort [must] be made to eliminate the distorting effects of hindsight." Strickland, 466 U.S. at 689.

Even if a claimant establishes that counsel's performance was constitutionally deficient, he must also demonstrate "that the decision reached [by the jury at trial] would reasonably likely have been different absent the errors." Id. at 696. This standard for prejudice is "not quite a 'more-probable-than-not standard,' [but] the difference 'is slight and matters only in the rarest case.'" Collins v. Roden, 749 F.3d 29, 32 (1st Cir. 2014) (quoting Harrington v. Richter, 562 U.S. 86, 112 (2011)).

## C.

Where, as here, AEDPA and Strickland intersect, the question for us is "not whether counsel's actions were reasonable." Field, 37 F.4th at 18 (quoting Harrington, 562 U.S. at 105). The question is whether "all fairminded jurists would agree that [the] final state court decision is at odds with [Strickland]." Bebo, 906 F.3d at 134 (citing Harrington, 562 U.S. at 102). The Supreme Court has described this as a "doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt." Burt v. Titlow, 571 U.S. 12, 15 (2013) (internal quotation marks omitted).

We review de novo the district court's determination that Martinez failed to clear these hurdles.  <u>Scott</u> v. <u>Gelb</u>, 810 F.3d 94, 98 (1st Cir. 2016) (citing <u>Sanchez</u> v. <u>Roden</u>, 753 F.3d 279, 293 (1st Cir. 2014)).

**III.**

As described above, the AEDPA analysis begins by considering the state post-conviction court's decision, <u>Martinez</u>, 2018 WL 1359478.[2]  Here, the state post-conviction court provided a detailed summary of the proceedings in front of it, focusing on the three-day hearing that it held, before turning to its <u>Strickland</u> analysis.  <u>Id.</u> at *1-10.  After examining Attorney Smith's reasoning, the state post-conviction court concluded that his decision to advance a no-premeditation defense, while saving Dr. Stewart's testimony for sentencing, was a strategic choice that was not constitutionally deficient.  <u>Id.</u> at *9-13.  The court therefore did not reach the issue of prejudice.  <u>Id.</u> at *13.  We explain below why we do not think that "all fairminded jurists would agree that [the state post-conviction court's] decision is

_____

[2]    The Rhode Island Supreme Court denied Martinez's cert petition during his state post-conviction proceedings, so the Rhode Island Superior Court's decision is the relevant one for our purposes.  <u>See</u> <u>Wilson</u>, 584 U.S. at 125; <u>cf.</u> <u>Dorisca</u>, 941 F.3d at 14 ("Where the highest state court -- in this case, the Massachusetts Supreme Judicial Court -- has denied review, we are to 'look through to the last reasoned decision' issued by the Massachusetts Appeals Court." (quoting <u>King</u> v. <u>MacEachern</u>, 665 F.3d 247, 252 (1st Cir. 2011))).

- 11 -

at odds with [Strickland]." Bebo, 906 F.3d at 134 (citing Harrington, 562 U.S. at 102).

### A.

The Supreme Court stated in Strickland that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," 466 U.S. at 690, and Martinez does not argue that counsel was deficient in his investigation. Martinez acknowledges, as he must, that Attorney Smith retained Dr. Stewart to examine him, provided Dr. Stewart with his medical records, and consulted Dr. Stewart after his examination. Instead, Martinez attacks the state post-conviction court's characterization of Smith's decisions as "strategic" and reasonable under the circumstances. He does so by arguing that the no-premeditation defense "amounted to no defense at all because it was legally and factually invalid."

Martinez is at least correct that Smith's no-premeditation defense faced an uphill climb. The undisputed evidence at trial showed that the killing was not impulsive and instantaneous. While Martinez and the state quarrel in their briefing over the relationship between a physical struggle and premeditation under Rhode Island law (a question with which we are not required to grapple), the cases cited by Martinez demonstrate that fact patterns bearing similarities to the one in this case have often led to first-degree murder convictions in the state.

See State v. Gumkowski, 223 A.3d 321, 323-24, 331-32 (R.I. 2020) (slashed throat); State v. Tassone, 749 A.2d 1112, 1114-15, 1119-21 (R.I. 2000) (blows from a shovel); State v. Campbell, 691 A.2d 564, 565, 572 (R.I. 1997) (stab and blunt-trauma wounds).

State v. Campbell is an exemplar. There, the Rhode Island Supreme Court left undisturbed the decision of a trial judge to decline to instruct the jury on second-degree murder in a case where there were no eyewitnesses to the killing but the victim had sustained fifteen to twenty lacerations, bruises, or contusions, and also bore signs of defensive wounds. 691 A.2d at 572 ("Our review of [the medical] testimony has led us to the ineluctable conclusion that [the victim] was viciously murdered in a manner that demonstrated more than momentary intent."). Campbell thus supports that it was going to be difficult for defense counsel to convince the jury that the wounds that Lindsay suffered were the result of Martinez acting with an intent to kill that -- in the words of the jury instructions -- "existed only fleetingly or momentarily before he committed the fatal act."

Nevertheless, the trial judge here did provide that second-degree murder jury instruction, and that fact is the point at which Martinez's argument hits a snag from which it ultimately cannot recover. That is because the instruction directly contradicts his claim that the no-premeditation defense was not "legally viable." There was no legal obstacle standing in the way

- 13 -

of the jury following the instruction and returning a verdict of second-degree murder.  And had the jury done so, the state would have been left with no further opportunity to secure a first-degree murder conviction.

Martinez does not press a viable response to the jury instruction having been provided.  He argues that the instruction is of no moment because the state did not object to it, and thus there was no reason for the trial judge not to give it.  But this argument fails to contend with the fact that the proposition that "instructions should not be given on lesser degrees of murder or manslaughter unless there is evidence in the case to support such a finding" is "well settled" according to the Rhode Island Supreme Court.  State v. Parkhurst, 706 A.2d 412, 423 (R.I. 1998) (first quoting State v. Tarvis, 465 A.2d 164, 171 (R.I. 1983)); see also Campbell, 691 A.2d at 572 (rejecting defendant's challenge to the trial judge's refusal to instruct on second-degree murder); Page v. State, 995 A.2d 934, 940 (R.I. 2010) (quoting a state post-conviction judge as saying, "There is no way on God's green earth that I could conceive of ever inviting, at least in [petitioner's] case, anything but a first degree murder instruction to the jury based on the facts that would have been produced.").

Martinez also does not consider the possibility that the state did not object to the second-degree murder instruction

because it believed that such an objection would be futile. To that end, while hearing a motion by Attorney Smith for a new trial, the trial judge stated that the jury could "absolutely" have come back with a verdict of second-degree murder. The trial judge also commended Smith for his excellence in defending Martinez. Martinez, 2018 WL 1359478, at *4. Such statements are hard to ignore, given that we are required to "eliminate the distorting effects of hindsight . . . and to evaluate [Attorney Smith's] conduct from [his] perspective at the time." Strickland, 466 U.S. at 689.

## B.

Martinez additionally attacks the state post-conviction court for not faulting Smith's decision to save Dr. Stewart's testimony for sentencing, but we cannot say that this was an unreasonable application of Strickland's deferential first prong. Indeed, the state post-conviction court found several plausible reasons why Smith could have made this decision.

First, the state post-conviction court found that Smith was worried that Dr. Stewart's testimony would open the door to damaging evidence about Martinez's past abusive behavior, not only towards Lindsay, but also towards other women. Martinez, 2018 WL 1359478, at *6-7. Smith knew that Lindsay's mother, supervisor at work, and new love interest were all prepared to testify about the abuse that Martinez inflicted on Lindsay on days other than the

one on which he killed her.  See Martinez, 59 A.3d at 85-87, 86 n.15.  He also knew that the state could produce testimony from both Martinez's ex-wife and another ex-girlfriend that Martinez had abused them during their relationships.  See Martinez, 2018 WL 1359478, at *6.  While some of this evidence eventually was offered at trial, much of it was not, including the testimony of Lindsay's mother as well as that of Martinez's ex-wife and ex-girlfriend.  See Martinez, 58 A.3d at 86 & n.15.  Had counsel offered Dr. Stewart's testimony to the jury, the state likely would have been able to impeach him by inquiring about these previously off-limit topics.  See Martinez, 2018 WL 1359478, at *6-7.  Saving Dr. Stewart for sentencing presented Smith with no such concerns.

Second, the state post-conviction court found that Smith believed that advancing a diminished capacity defense based on Dr. Stewart's testimony would be futile given the overwhelming evidence against Martinez.  Id. at *12.  There was never any question in this case that Martinez killed Lindsay.  In addition to the graphic photos taken at the crime scene, Smith knew that the jury would view Martinez's videotaped statement (where he appeared "calm, cool, and collected" shortly after the killing) and his suicide note, each of which contained a confession.  Id. at *5.  We cannot say that the state post-conviction court unreasonably erred when it credited Smith's belief that a jury -- when faced with such disturbing evidence -- would look

with disfavor on an attempt to attribute Martinez's actions to PTSD. Indeed, the trial judge lent support to the validity of Smith's concern when, at sentencing, the judge characterized Martinez's mitigation efforts -- including Dr. Stewart's testimony -- as "shallow attempt[s] to blame others" for the "vile, heinous[,] and completely unnecessary[,] unjustified slaying." Id. at *1 (second and third alterations in original).

Third, the state post-conviction court found that Smith decided that Dr. Stewart's testimony would be more likely to convince the trial judge to spare Martinez from life without parole if the judge heard it for the first time at sentencing.[3] Id. at *7. Such a decision by counsel would be more problematic had he not mounted any defense at trial. But, as discussed above, Smith in fact put on a no-premeditation defense that the trial judge

---

[3] We note that the state post-conviction hearing transcript is ambiguous and could alternatively be read to suggest that Smith mistakenly believed that he may not have been able to introduce Dr. Stewart's testimony at sentencing had he already used it at trial. Martinez alludes to this when he argues that the state post-conviction court failed to consider that the sentencing judge had a "statutory duty" to consider Dr. Stewart's testimony at sentencing. See R.I. Gen. Laws § 12-19.2-4; see also State v. Tiernan, 645 A.2d 482, 485-86 (R.I. 1994) (articulating the importance of refusing to condone the punishment of a defendant with a harsher sentence for exercising their constitutional rights). However, the state post-conviction court's determination here -- i.e., that Smith was merely worried that Dr. Stewart's testimony would have less of an impact at sentencing if it had already been presented at trial -- also has support in the transcript and is entitled to our deference. See Teti v. Bender, 507 F.3d 50, 58-60 (1st Cir. 2007).

- 17 -

deemed to be "excellent." Thus, when the state post-conviction court credited Smith's decision, it simply reflected a recognition of the commonsense notion that information is often the most impactful the first time it is delivered and carries less weight during subsequent presentations.

In support of its conclusion that each of these reasons justified Smith's decision to save Dr. Stewart's testimony for sentencing, the state post-conviction court pointed to Smith's pre-trial consultation with Robert Mann, another member of the Rhode Island bar. Id. at *6. Mann was "a highly respected criminal defense attorney" who had "tried difficult forensic psychiatric cases." Id. After hearing about Martinez's situation, Mann warned Smith that impeachment of an expert witness like Dr. Stewart with evidence of Martinez's prior domestic abuse could be "devastating" and suggested that the PTSD diagnosis "would be put to better use as mitigation in the sentencing phase of the case." Id. As with counsel's retention of Dr. Stewart, his consultation with Mann demonstrates that this is not an instance of a trial counsel simply failing to investigate the case or making woefully inadequate strategic choices.

Martinez responds to the state post-conviction court's logic by downplaying the risk that evidence of his previous abusive behavior posed, reasoning that it would not have prompted Dr. Stewart to change his diagnosis. But in doing so, Martinez

overlooks the fact that Smith was worried about a different risk -- that the evidence would leave the jury less likely to credit Dr. Stewart's testimony.  See id. at *6.  Martinez also seeks to navigate any concern about the potentially limited ability of Dr. Stewart's testimony to overcome the disturbing evidence against him by pointing to the fact that Dr. Stewart's diagnosis has never been rebutted.  But of course the state never had the opportunity to challenge that diagnosis at trial, and in any event, the unrefuted diagnosis also failed to convince the sentencing judge to grant Martinez any form of leniency.  See id. at *1.

Finally, Martinez acknowledges that Robert Mann is "well-respected and extremely knowledgeable," but characterizes Smith's interaction with him as "an informal brief courthouse conversation with an attorney who knew nothing about the case." Hyperbole aside -- Mann surely knew more than nothing -- it was reasonable for the state post-conviction court to rely on Smith's consultation with a respected member of the Rhode Island legal community to further justify its finding that Smith's decision to save Dr. Stewart's testimony for sentencing was "reasonable[] under prevailing professional norms."  Strickland, 466 U.S. at 688.

## C.

Further supporting the conclusion that the state post-conviction court did not unreasonably apply the performance

prong of Strickland is the fact that none of the cases cited by Martinez compel a different holding.

Martinez quotes Profitt v. Waldron, 831 F.2d 1245 (5th Cir. 1987), a pre-AEDPA decision, for the proposition that, in Martinez's words, "a decision by trial counsel 'cannot [be] baptize[d] . . . with rejuvenating labels of tactical or strategic choice' if that decision is unreasonable." (Quoting Profitt, 821 F.2d at 1249) (internal quotation marks omitted). But trial counsel's challenged decision in Profitt had far less justification than Attorney Smith's decision here.

In Profitt, the defendant escaped from a mental institution in Idaho and traveled to Texas, where he raped a woman. 831 F.2d at 1247. The defendant's trial counsel knew about the escape, but fully abandoned his plan to mount an insanity defense after a court-appointed psychiatrist deemed the defendant sane at the time he committed the offense and fit to stand trial. Id. at 1247, 1249. Trial counsel did not make any inquiry of the mental institution (which would have revealed that an Idaho court had adjudicated the defendant insane), seek a continuance, or attempt to put on any other defense. Id. at 1248-49. The Fifth Circuit granted habeas relief on the petitioner's Strickland claim both because it "simply c[ould] see no advantage in the decision to bypass the insanity defense" and because the decision was based on "information that was faulty [due to trial counsel's] ineffective

investigatory steps." Id. at 1249. Here, as we have explained, there was some advantage in the decision to save Dr. Stewart's testimony for sentencing, and there is no allegation that Attorney Smith was ineffective in his investigation. Profitt is inapposite.

Martinez next cites Washington v. Hofbauer, 228 F.3d 689 (6th Cir. 2000), as an example of a federal court granting habeas relief where a state post-conviction court failed to sufficiently scrutinize trial counsel's explanation for counsel's decisions. But the facts underlying the petitioner's ineffective assistance of counsel claim in Washington bear no resemblance to the facts underlying Martinez's claim. See 228 F.3d at 695-97.

More to the point, Washington was decided before the Supreme Court had fully elucidated the deference due to state court decisions under 28 U.S.C. § 2254, as amended by AEDPA. That development did not occur until Harrington v. Richter, 562 U.S. 86 (2011), in which the Supreme Court concluded that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 101 (emphasis added) (quoting Yarborough, 541 at 664). The Washington court, however, articulated the relevant standard as "whether the state court's application of clearly established federal law was 'objectively reasonable.'" 228 F.3d at 698 (emphasis added)). In doing so, the Washington court explicitly declined to adopt a

standard that referred to a "reasonable jurist," see id. -- a standard essentially identical to the one that was adopted later by the Supreme Court in Harrington. See also Brian R. Means, Federal Habeas Manual 507-10 (2023) (discussing the evolution of courts' interpretations of the deference due to state court decisions under AEDPA and concluding that "[r]esurrection of the reasonable jurist test was made complete with the [Supreme] Court's decision in Harrington v. Richter"). Washington cannot carry Martinez's burden.

Finally, Martinez cites Workman v. Superintendent Albion SCI, 915 F.3d 928 (3d Cir. 2019), as an example of a federal court granting habeas relief on an ineffective assistance of counsel claim because the petitioner's trial counsel entirely failed to offer any plausible rebuttal to the evidence presented by the prosecution. The case can be read as having some factual similarities to Martinez's, which may provide support for his arguments regarding Strickland's performance prong. But Workman does nothing to help Martinez overcome AEDPA's deference because the court there was reviewing the petitioner's claim de novo because the state court did not consider the claim on the merits. 915 F.3d at 943 (quoting Bey v. Superintendent Greene SCI, 856 F.3d 230, 236 (3d Cir. 2017)). We are not so free from restraint here.

Rather than any of the decisions to which Martinez points, we find his petition most comparable to Hensley v. Roden, 755 F.3d 724 (1st Cir. 2014). Hensley was also a habeas case premised, in part, on an ineffective assistance of counsel claim. Id. at 726-27. And there, too, the Strickland claim focused on the decision of trial counsel to not present the jury with a psychiatrist's testimony that the defendant lacked the mental capacity to form the requisite intent for first-degree murder. Id. at 729-30, 735-38. We found that the petitioner was "not even close to surmounting" the hurdles set up by AEDPA, in large part because the psychiatrist's testimony -- despite concluding that the petitioner could not have formed the requisite criminal intent -- would have been "a mixed bag." Id. at 736-38. As discussed above, Dr. Stewart's testimony here would also have been a mixed bag, most notably because it would have opened the door to damaging evidence about Martinez's previous abuse of Lindsay and other partners.

To be sure, Hensley is not on all fours with Martinez's case; the trial counsel there did mount a mental impairment defense, choosing to call friends and family of the defendant rather than the psychiatrist that trial counsel had retained. Id. at 728. But that differentiating factor is far less significant than the ones in the cases to which Martinez analogizes. Hensley further forecloses Martinez's claim.

**IV.**

In sum, counsel was put to a difficult choice between whether to mount a defense of Martinez based on no-premeditation or on diminished capacity.  One could argue, with the benefit of hindsight, that counsel should have made a different decision.  But under the deferential framework of Strickland, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  466 U.S. at 690.  Martinez bears the burden of showing that all fairminded jurists would disagree with the state post-conviction court's application of that framework.  He has failed to do so.  Because we conclude that the state post-conviction court did not unreasonably apply the performance prong of Strickland, we -- like the state post-conviction court -- need not reach the prejudice prong of the analysis.

For the foregoing reasons, the district court's dismissal of Martinez's petition is **affirmed**.